Rodolfo RABANG; Jose Tion Guillo; Leonora Ver Sanidad; Alfredo Maglinao; Josephine Ycaro; Michael Ycaro; John Ycaro, Plaintiffs–Appellants,

v.

IMMIGRATION AND NATU-
RALIZATION SERVICE,
Defendant–Appellee.

No. 91–16125.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1992.

Decided Sept. 20, 1994.

Ronald T. Oldenberg, Honolulu, HI, for plaintiffs-appellants.

Lisa Dornell, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for defendant-appellee.

Before: TANG, PREGERSON, and ALARCON, Circuit Judges.

Opinion by Judge TANG; Dissent by Judge PREGERSON.

TANG, Senior Circuit Judge:

Rodolfo Rabang and six other individuals appeal from the district court's dismissal of their complaints for failure to state a claim for relief. The complaints allege that plaintiffs or their parents were born in the Philippine Islands when those islands were United States territory, and seek declaratory judgments that plaintiffs are United States citizens under the Citizenship Clause of the Fourteenth Amendment, or under the Citizenship Clause in conjunction with § 301 of the Immigration and Nationality Act, 8 U.S.C. § 1401 (citizenship by descent). We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

At the close of the Spanish–American War on December 10, 1898, Spain ceded the Philippine Islands to the United States by treaty. *See* Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.–Spain, art. III, 30 Stat. 1754, 1755 (hereafter "Treaty of Paris").[1] That treaty provided that "[t]he civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." Treaty of Paris, *supra,* art. IX, 30 Stat. at 1759.

The United States maintained military rule over the Philippine Islands until 1902. 2 R. Hofstadter, W. Miller & D. Aaron, *The American Republic* 340 (1959). Congress then enacted the Philippine Government Act, which established the terms of United States' civilian rule over the Philippines. *See* ch. 1369, 32 Stat. 691 (1902). That enactment provided that certain inhabitants of the Philippine Islands as of April 11, 1899 and "their children born subsequent thereto" were deemed "citizens of the Philippine Islands and as such entitled to the protection of the United States...." § 4, 32 Stat. at 692. It also provided that the Constitution and laws of the United States would not apply to the Philippines.[2] § 1, 32 Stat. at 692.

In 1916, Congress adopted the Philippine Autonomy Act to "declare the purpose of the

---

1. By the same treaty, Spain also ceded to the United States the islands of Puerto Rico and Guam, and relinquished its sovereignty over Cuba. *See* Treaty of Paris, *supra,* arts. I, II, 30 Stat. at 1755.

The inhabitants of Puerto Rico and Guam have been granted United States citizenship by statute. *See* Organic Act of Puerto Rico, ch. 145, § 5, 39 Stat. 951, 953 (1917) (conferring United States citizenship on some Puerto Rican citizens); Nationality Act of 1940, ch. 876, § 202, 54 Stat. 1137, 1139 (1940) (conferring citizenship on all those born in Puerto Rico after 1899); Organic Act of Guam, ch. 512, § 4(a), 64 Stat. 384, 384 (1950) (conferring United States citizenship on Guamanians). The United States never exer-

cised sovereignty over Cuba, declaring instead that control over Cuba should be left "to its people." *See* H.R.J.Res. 24, § 4, 55th Cong., 2d Sess., 30 Stat. 738 (1898).

2. The Philippine Government Act declared that "[t]he provisions of section [1891] of the Revised Statutes of [1878] shall not apply to the Philippine Islands." § 1, 32 Stat. at 692. Section 1891 of the Revised Statutes of 1878, in turn, provided that:

The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized Territories, and in every Territory

people of the United States as to the future political status of the people of the Philippine Islands, and to provide a more autonomous government for those islands." Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916). That act reiterated that "all inhabitants of the Philippine Islands who were Spanish subjects on [April 11, 1899] ... and their children born subsequent thereto, shall be deemed ... citizens of the Philippine Islands." § 2, 39 Stat. at 546.

Finally, thirty-five years after the United States acquired the Philippine Islands, Congress adopted the Philippine Independence Act. *See* Philippine Independence Act, ch. 84, 48 Stat. 456 (1934). That act provided for the adoption of "a constitution for the government of the Commonwealth of the Philippine Islands," § 1, 48 Stat. at 456, and for the complete withdrawal of United States sovereignty ten years after the adoption of a Philippine constitution. § 10(a), 48 Stat. at 463 (codified at 22 U.S.C. § 1394(a) (1990)). The act also declared that citizens of the Philippine Islands who were not also citizens of the United States were to be considered "aliens" under the immigration laws of the United States. § 8(a)(1), 48 Stat. at 462.

On July 4, 1946, the United States relinquished control over the Philippine Islands and declared them to be an independent sovereign, thus ending their status as a United States territory. *See* Proclamation No. 2695, 60 Stat. 1352, 11 Fed.Reg. 7517 (1946), *reprinted in* 22 U.S.C. § 1394 (1990).

## DISCUSSION

### I.

■■■ The government argued to the district court that the plaintiffs had failed to exhaust their administrative remedies. Although the government does not raise this issue on appeal, we must *sua sponte* consider whether there is subject matter jurisdiction over this appeal. *See McGuckin v. Smith,* 974 F.2d 1050, 1052 (9th Cir.1992). Because the Board of Immigration Appeals has no

jurisdiction to adjudicate constitutional issues, the plaintiffs' failure to raise their challenge at the administrative level does not deprive this court of jurisdiction. *See Hernandez–Rivera v. INS,* 630 F.2d 1352, 1355–56 (9th Cir.1980).

### II.

The district court consolidated these cases, and the government moved to dismiss them under Fed.R.Civ.P. 12(b)(6). The district court granted the government's motion to dismiss.

■■■ A dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is a ruling on a question of law and is reviewed *de novo. Buckey v. County of Los Angeles,* 968 F.2d 791, 793–94 (9th Cir.), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 599, 600, 121 L.Ed.2d 536 (1992). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.* The decision of the district court may be affirmed on any ground supported in the record. *Oscar v. University Students Cooperative Ass'n,* 965 F.2d 783, 785 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 655, 656, 121 L.Ed.2d 581 (1992).

### III.

All plaintiffs in this case are at some stage of deportation proceedings brought against them by the Immigration and Naturalization Service. Each complaint seeks declaratory judgment that the plaintiffs are entitled to citizenship under the Citizenship Clause of the Fourteenth Amendment. The plaintiffs allege that they or their parents were born in the Philippines during the territorial period, that during this time the Philippine Islands were "in the United States," and that plaintiffs were subject to the jurisdiction of the United States at their birth. They therefore claim that they (or their parents) were born "in the United States" and thus constitutionally entitled to citizenship.[3]

---

hereafter organized as elsewhere within the United States.

Rev.Stat. of 1878, ch. 1, § 1891, 18 Stat. 325, 333 (1874).

**3.** With respect to those who assert that their parents were born in the Philippines during the

territorial period, the complaints also allege that these plaintiffs meet the applicable statutory requirements for acquisition of United States citizenship by descent. *See* 8 U.S.C. § 1401 (Supp. 1993). Because the district court's dismissal was based solely on the conclusion that birth in the

**1452**

The Citizenship Clause of the Fourteenth Amendment provides that:

All persons *born* or naturalized *in the United States* and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV (emphasis added).

No court has addressed whether persons born in a United States territory are born "in the United States," within the meaning of the Fourteenth Amendment.[4] The courts have, however, uniformly rejected claims that people born in the Philippines during the territorial period retained their "national" status [5] after Philippine independence. *See, e.g., Rabang v. Boyd,* 353 U.S. 427, 430–31, 77 S.Ct. 985, 987–88, 1 L.Ed.2d 956 (1957) (rejecting claim that status as a United States "national" was so related to "citizenship" that U.S. relinquishment of the Philippine Islands could not divest petitioner of his U.S. nationality); *Manguerra v. INS,* 390 F.2d 358, 360 (9th Cir.1968) (rejecting argument that United States nationality could not be taken away without consent); *Cabebe v. Acheson,* 183 F.2d 795, 800 (9th Cir.1950) (rejecting claim that Congress did not have power to divest petitioner of nationality).

■ We now hold that birth in the Philippines during the territorial period does not

constitute birth "in the United States" under the Citizenship Clause of the Fourteenth Amendment, and thus does not give rise to United States citizenship.

In the *Insular Cases* [6] the Supreme Court decided that the territorial scope of the phrase "the United States" as used in the Constitution is limited to the states of the Union. Those cases addressed challenges to the imposition of duties on goods shipped from Puerto Rico to the continental United States. The Court held that Puerto Rico was "not a part of the United States within the revenue clauses of the Constitution." *Downes v. Bidwell,* 182 U.S. 244, 287, 21 S.Ct. 770, 787, 45 L.Ed. 1088 (1901). *See* U.S. Const. art I, § 8 ("all duties, imposts, and excises shall be uniform *throughout the United States*") (emphasis added).[7]

■ In arriving at this conclusion, the Court compared the language of the revenue clause ("all duties ... shall be uniform throughout the United States") with that of the Thirteenth Amendment (prohibiting slavery "within the United States, *or* in any place subject to their jurisdiction") and the Fourteenth Amendment (extending citizenship to those born "in the United States, *and* subject to the jurisdiction thereof"). *Id.* at 251, 21 S.Ct. at 773 (emphasis added). The Court

---

territorial Philippines does not confer United States citizenship, this appeal does not concern any other issues related to citizenship by descent. *See* § 1401(c)–(g) (Supp.1993) (listing the various conditions for citizenship by descent).

**4.** This claim has been raised, but not addressed by the courts. *See, e.g., Resurreccion–Talavera v. Barber,* 231 F.2d 524, 525 (9th Cir.1956); *Gancy v. United States,* 149 F.2d 788, 789 (8th Cir.), *cert. denied,* 326 U.S. 767, 66 S.Ct. 166, 90 L.Ed. 463 (1945).

**5.** The term "national" came into popular use in this country when the United States acquired territories outside its continental limits, and was used in reference to noncitizen inhabitants of those territories. 4 Charles Gordon and Stanley Mailman, *Immigration Law and Procedure,* § 91.-01[3][b], at 91–5 (1993). Nonetheless, Congress did not define that term until 1940. *See* Nationality Act of 1940, *supra* note 1, §§ 101(a), 204, 54 Stat. at 1137, 1139; 4 C. Gordon and S. Mailman, *supra,* § 91.01[3][b], at 91–5. The current definition of the term "national" was adopted in the Immigration and Nationality Act of 1952, ch. 477, § 101(a)(22), 66 Stat. 163, 169 (1952), and is codified at 8 U.S.C. § 1101(a)(22) (1990) (a

"national" is a citizen of the United States and a person who, though not a citizen, owes permanent allegiance to the United States).

**6.** *De Lima v. Bidwell,* 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States,* 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States,* 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); and *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). The holdings of the *Insular Cases* were recently reaffirmed by the Supreme Court and remain valid law. *See United States v. Verdugo–Urquidez,* 494 U.S. 259, 268–69, 110 S.Ct. 1056, 1062–63, 108 L.Ed.2d 222 (1990).

**7.** Regarding application of other constitutional provisions to Puerto Rico and the Philippines, *see also, Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Ocampo v. United States,* 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); and *Hawaii v. Mankichi,* 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903).

emphasized that the language of the Thirteenth Amendment demonstrates that "there may be places within the jurisdiction of the United States that are no part of the Union." *Id.* In comparison, the Fourteenth Amendment has "a limitation to persons born or naturalized in the United States *which is not extended to persons born in any place 'subject to their jurisdiction.'* " *Id.* (emphasis added). Like the revenue clauses, the Citizenship Clause has an express territorial limitation which prevents its extension to every place over which the government exercises its sovereignty. *Cf. United States v. Verdugo–Urquidez,* 494 U.S. 259, 291 n. 11, 110 S.Ct. 1056, 1074–75, 108 L.Ed.2d 222 (1990) (Brennan, dissenting) (distinguishing *Downes* holding regarding the revenue clauses, because the Fourth Amendment "contains no express territorial limitations").

██ The *Downes* Court further stated: "[I]n dealing with foreign sovereignties, the term 'United States' has a broader meaning than when used in the Constitution, and includes all territories subject to the jurisdiction of the Federal government, wherever located." *Downes,* 182 U.S. at 263, 21 S.Ct. at 777. In other words, as used in the Constitution, the term "United States" does not include all territories subject to the jurisdiction of the United States government. *See also Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 588 n. 19, 96 S.Ct. 2264, 2274 n. 19, 49 L.Ed.2d 65 (1976), *citing* H.R.Rep. No. 249, 56th Cong., 1st Sess., 16 (1900) ("upon reason and authority the term 'United States' as used in the Constitution, has reference only to the States that constitute the Federal Union and does not include the Territories.")

██ It is thus incorrect to extend citizenship to persons living in United States territories simply because the territories are "subject to the jurisdiction" or "within the dominion" of the United States, because those persons are not born "in the United States" within the meaning of the Fourteenth Amendment.[8]

## IV.

The dissent relies on dicta in two Supreme Court cases to conclude that birth in a United States territory constitutes birth "in the United States" under the Fourteenth Amendment. In *United States v. Wong Kim Ark,* 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898), the Supreme Court held that a person born in San Francisco, California, of Chinese parents, could not be excluded from the United States under the Chinese Exclusion Acts after a temporary visit to China. The Supreme Court held that the Citizenship Clause confers citizenship "by birth within the territory." *Id.* at 693, 18 S.Ct. at 473. In *Inglis v. Sailors' Snug Harbour,* 28 U.S. 99, 155, 3 Pet. 99, 155, 7 L.Ed. 617 (1830), Mr. Justice Story in his concurring and dissenting opinion to the majority opinion explained that citizenship by birth arises by "birth locally within the dominions of the sovereign; and ... birth within the protection and obedience ... of the sovereign."

Focusing upon the phrases "within the territory" and "within the dominions," the dissent concludes that persons born in territories of the United States are born "in the United States." As previously discussed, the Supreme Court has already interpreted the territorial scope of the phrase "the United States" as used in the Constitution as limited

---

**8.** We note that the territorial scope of the phrase "the United States" is a distinct inquiry from whether a constitutional provision should extend to a territory, *see Downes,* 182 U.S. at 249, 21 S.Ct. at 772, and we rely on the *Insular Cases* only to determine the meaning of the phrase "in the United States." While we are mindful of plaintiffs' claims that the district court erroneously excluded expert evidence regarding the history of the acquisition of the Philippine Islands and the racist sentiments that motivated the United States' treatment of the Philippines and the *Insular Cases,* we affirm the district court's dismissal on an issue of law only.

Because we conclude that birth in the Philippines does not give rise to citizenship under the

Fourteenth Amendment, we need not decide whether citizenship is a "fundamental right" which would extend of its own force to a territory under the "territorial incorporation" doctrine.

We hasten to add that if the plaintiffs were entitled to citizenship under the Fourteenth Amendment, this would not conflict with Congress' constitutional power to regulate naturalization, as urged by the government. The power to confer citizenship through naturalization does not confer the power to take citizenship away. *See Wong Kim Ark,* 169 U.S. at 703, 18 S.Ct. at 477–78 (Congress has no authority to restrict the effect of citizenship by birth); *Afroyim v. Rusk,* 387 U.S. 253, 257, 87 S.Ct. 1660, 1662–63, 18 L.Ed.2d 757 (1967) (same).

to the states of the Union. Moreover, the dissent elevates the significance of this dicta in these cases.

There is no indication that the Court in *Wong Kim Ark* and *Inglis* would have used such broad language had it been faced with the facts of the case before us. *Wong Kim Ark* involved a person born in San Francisco, California. The fact that he had been born "within the territory" of the United States was undisputed, and made it unnecessary to define "territory" rigorously or decide whether "territory" in its broader sense (i.e. outlying land subject to the jurisdiction of this country) meant "in the United States" under the Citizenship Clause. The outcome in *Inglis* also did not depend on the meaning of "in the United States." Decided *prior* to the enactment of the Fourteenth Amendment, that case addressed whether a person born in the colonies prior to the Declaration of Independence, whose parents remained loyal to England and left the colonies after independence, was a citizen and thus capable of inheriting land in the United States. It was simply unnecessary to address the territorial scope of citizenship under common law.

A focus on these select phrases is also misleading in view of the ambiguous ways in which the Court at other places defines the territorial scope of citizenship. *See Wong Kim Ark,* 169 U.S. at 658, 18 S.Ct. at 460 (under the English common law rule, "every child born *in England* of alien parents was a natural-born subject") (emphasis added) [9]; *id.* at 661, 18 S.Ct. at 461–62 ("[p]ersons who are born *in a country* are generally deemed citizens and subjects of that country") (emphasis added; citation omitted); *id.* at 665, 18 S.Ct. at 463 ("[t]he right of citizenship . . . is incident to birth *in the country*") (emphasis added; citation omitted). *But see, id.* at 666, 18 S.Ct. at 463 ("mere birth *within the realm* gives the rights of a native-born citi-

zen") (emphasis added; citation omitted); *id.* at 667, 18 S.Ct. at 463–64 (discussing the "ancient rule of citizenship by birth *within the dominion*") (emphasis added); *id.* at 674, 18 S.Ct. at 466–67 ("the fundamental rule of citizenship by birth *within its sovereignty*") (emphasis added); *id.* at 675, 688, 18 S.Ct. at 467, 471–72 (reaffirmation by the Fourteenth Amendment of citizenship by birth *"within the dominion"*) (emphasis added).

A selective focus on language supporting a broad interpretation of the Citizenship Clause is an unjustified reliance on dicta. The Court in *Wong Kim Ark* cautioned against the use of dicta in determining the meaning of "subject to its jurisdiction" in the Fourteenth Amendment: "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." 169 U.S. at 679, 18 S.Ct. at 468. Neither *Wong Kim Ark* nor *Inglis* decided the meaning of "in the United States" in the Fourteenth Amendment.

## CONCLUSION

The Philippine Islands are now a sovereign nation. Supreme Court precedent compels a conclusion that persons born in the Philippines during the territorial period were not "born . . . in the United States," within the meaning of the Citizenship Clause of the Fourteenth Amendment, and are thus not entitled to citizenship by birth.

**AFFIRMED.**

PREGERSON, Circuit Judge, dissenting:

In determining that the Fourteenth Amendment Citizenship Clause requires that a person be born in the states of the Union, the majority opinion incorrectly relies on

9. Wholesale importation of British common law on "subject" status to interpret the meaning of the Citizenship Clause is inadvisable because of possible differences between "subjects" and "citizens." The Supreme Court has given inconsistent pronouncements on whether the concept of "subject" and "citizen" are the same. *See Wong Kim Ark,* 169 U.S. at 656, 18 S.Ct. at 459–60 ("subject" or "political status" may be quite different from "citizenship" or "civil status"); *Chisholm v. Georgia,* 2 U.S. 419, 455, 2 Dall. 419,

455, 1 L.Ed. 440 (1793) ("Under [the] constitution, there are *citizens,* but no *subjects.*"). *But see Wong Kim Ark,* 169 U.S. at 664, 18 S.Ct. at 462–63 ("The term 'citizen' . . . is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government."), and *id.* at 665, 18 S.Ct. at 463 ("Subject and citizen are, in a degree, convertible terms *as applied to natives.*") (emphasis added; citation omitted).

very limited language from the Revenue Clause of Article I, Section 8 of the Constitution and on just one of the *Insular Cases.* This narrow approach overlooks principles of common law, readily accepted by the framers of the Constitution and the authors of the Fourteenth Amendment, which demonstrate that the Citizenship Clause applies to all persons who owe allegiance to, and are born within the territory or dominion of, the United States.

The majority opinion looks for support to only one of the *Insular Cases,* i.e., *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). *Downes,* which extensively discusses the history and meaning of the Revenue Clause, does not purport to interpret the Citizenship Clause, or any other provision of the Constitution. And, the majority opinion acknowledges in footnote 8 that the issue of territorial scope of the phrase "in the United States" as found in the Citizenship Clause is not an issue in *Downes,* which was concerned solely with whether the Revenue Clause applied to the territory of Puerto Rico.

Further, the Revenue Clause, on which the majority opinion heavily relies, states:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States.

The history, meaning, function, and subject matter of the Revenue Clause clearly differ from those of the Citizenship Clause. In short, neither *Downes* nor the Revenue Clause has anything to do with the citizenship status of a person born in a United States territory.

But more importantly, the history of the Fourteenth Amendment and its jurisprudence demonstrate unequivocally that the framers intended the term "in the United States" to refer to all persons born within United States' territory. Far from providing "ambiguous" dicta as the majority opinion

suggests, the Supreme Court's exhaustive opinion in *United States v. Wong Kim Ark,* 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898), makes clear that the Fourteenth Amendment was intended to codify existing common law on the subject of United States citizenship. In addition, *Wong Kim Ark* cites numerous common law sources and authorities which indicate that all persons born within the *territory* of a sovereign nation and who owe complete allegiance to that nation are deemed "natural born" for purposes of citizenship. Thus, I would hold that persons born in the Philippines during the territorial period—between December 10, 1898 and July 4, 1946—should be considered United States citizens within the meaning of the Fourteenth Amendment's Citizenship Clause.

## DISCUSSION

As the majority opinion notes, since 1946 persons born in the Philippines during the territorial period have unsuccessfully advanced various theories to establish that they were not "aliens" with respect to the United States. Many of these plaintiffs (as well as the courts) assumed that persons born in the Philippines during the territorial period acquired status only as United States "nationals" at birth. *See, e.g., Rabang v. Boyd,* 353 U.S. 427, 430, 77 S.Ct. 985, 987, 1 L.Ed.2d 956 (1957); *Manguerra v. INS,* 390 F.2d 358, 360 (9th Cir.1968); *Cabebe v. Acheson,* 183 F.2d 795, 800 (9th Cir.1950); *Gancy v. United States,* 149 F.2d 788, 789 (8th Cir.), *cert. denied,* 326 U.S. 767, 66 S.Ct. 166, 90 L.Ed. 463 (1945). What is significant about these earlier cases is that the courts, without considering the Citizenship Clause, *assumed* that the United States was free to grant or withhold citizenship to the people of the Philippines while the Islands were under the complete dominion and control of the United States.[1]

In the case before us, however, Plaintiffs seek declaratory and injunctive relief under a *new* theory which directly challenges the constitutional validity of this earlier assumption.[2]

---

1. Although Congress may grant citizenship, it is indisputable that it does *not* have the power to take it away. *See Afroyim v. Rusk,* 387 U.S. 253, 257, 87 S.Ct. 1660, 1662–63, 18 L.Ed.2d 757 (1967) (the Constitution grants the government "no power, even under its express power to pass

a uniform rule of naturalization," to revoke United States citizenship).

2. We found only two published decisions in which this issue was raised. In a case before this Court, a plaintiff claimed citizenship under

Plaintiffs contend that by virtue of their birth, or their parents' birth, in the Philippines during the territorial period, they qualify as United States citizens under the Citizenship Clause of the Fourteenth Amendment. The District Court dismissed Plaintiffs' cases without analyzing this new claim of citizenship based on the Fourteenth Amendment. Instead, the District Court observed that the earlier cases were unanimous in their view that persons born in the Philippines during the territorial period were United States nationals, not citizens, and refused to "rewrite the law" regarding the status of persons born in the Philippines.

But a careful examination of the history underlying the passage of the Fourteenth Amendment and the common law underlying our Constitution leads me to conclude that the District Court and the majority opinion wrongly decided Plaintiffs' citizenship claim. I submit that persons living in the Philippine Islands who owed complete allegiance to, and were under the complete dominion and control of, the United States during the territorial period are constitutionally entitled to citizenship under the Fourteenth Amendment.

The first sentence of the Fourteenth Amendment, Section 1 (the "Citizenship Clause") provides that:

> All persons *born* or naturalized *in the United States*, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

the Fourteenth Amendment based on his birth "in the Philippine Islands at a time when the United States exercised sovereignty over those possessions." *See Resurreccion–Talavera v. Barber*, 231 F.2d 524, 525 (9th Cir.1956). We did not, however, address this claim. Rather, after stating plaintiff's contention, we merely declared that plaintiff's birth in the Philippines in 1934 accorded him the status of a "non-citizen national." *Id.* In so doing, we relied on two earlier decisions by this court concerning a related, but distinct issue, and did not address the Fourteenth Amendment claim. *Id.* Because the court in *Resurreccion–Talavera* ignored the plaintiff's Fourteenth Amendment claim, that decision has no precedential effect on this issue.

In an unrelated administrative proceeding, the Board of Immigration Appeals did address this very issue. *See Matter of Hermosa*, 14 I. &

U.S. Const. amend. XIV (emphasis added). The critical issue presented in this case is whether persons born in the Philippine Islands during the period those islands were United States territory were "born ... in the United States" within the meaning of the Fourteenth Amendment.[3]

I agree with the majority opinion that, to determine whether Plaintiffs' complaints state a claim for relief, we must first define the term "in the United States" as used in the Citizenship Clause. In defining that term, the majority opinion incorrectly relies on the Revenue Clause and on limited language in *Downes* to conclude that the Fourteenth Amendment applies only to the states of the Union. Such a conclusion ignores a large body of common law summarized in *Wong Kim Ark* which indicates that the Citizenship Clause confers citizenship by birth within the territory of the sovereign nation. Additionally, assuming that the reasoning in *Downes* applies, I would still dissent because I believe that the right to citizenship by birth is among those fundamental constitutional rights which must apply by their own force even under *Downes.*

## A. Meaning of the Citizenship Clause

As the majority opinion notes, the words of the Fourteenth Amendment do not define on their face the meaning of the phrase "in the United States" to determine the right to citizenship by birth. Therefore, that scope should not be determined without recourse to the history and purposes of the Fourteenth Amendment. Based on the Revenue Clause

N.Dec. 447 (1973). In that case, plaintiff argued that, under the Fourteenth Amendment, she acquired United States citizenship by birth in the Philippines in 1943. In rejecting Hermosa's argument, the Board relied on the *statutory* definition of the term "the United States" adopted as part of the Nationality Act of 1940, *see* § 101(d), 54 Stat. at 1137. The Board reasoned that because the Philippines were not among the geographic areas listed in that statutory definition, Hermosa was not born "in the United States" within the meaning of the Fourteenth Amendment. 14 I. & N.Dec. at 448–49.

**3.** Neither the Government nor the majority opinion contends that Plaintiffs were not "subject to the jurisdiction" of the United States at their birth, within the meaning of the Citizenship Clause.

and dicta from *Downes,* the majority opinion expresses the view that Congress may deny citizenship to persons born in the United States' territories because birth outside of the states of the Union is not covered under the Fourteenth Amendment. This view does not square with the intentions of the authors of the Fourteenth Amendment, nor with the plain language of the cases that have actually addressed the Citizenship Clause.

*United States v. Wong Kim Ark,* decided by the United States Supreme Court nearly a century ago, discusses at length the importance and status of the common law rule of citizenship by birth in determining the meaning of the Citizenship Clause. Thus, *Wong Kim Ark* must guide our determination of whether the Citizenship Clause confers United States citizenship on persons born in the Philippine Islands during the territorial period. In *Wong Kim Ark,* the Court held that a person born in the United States, of parents born in China, could not be excluded from the United States under the Chinese Exclusion Acts. In reaching its decision, the Court exhaustively examined the meaning and scope of the Citizenship Clause. At the outset, the Court discussed the importance of the common law in interpreting the Fourteenth Amendment.

> The constitution nowhere defines the meaning of these words [of the Fourteenth Amendment], either by way of inclusion or of exclusion.... [I]t must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution....
>
> In *Minor v. Happersett,* [21 Wall. 162] (1874) Chief Justice Waite, when construing, in behalf of the court, the very provision of the fourteenth amendment now in question, said: "The constitution does not, in words, say who shall be natural-born citizens. Resort must be had elsewhere to

ascertain that." And he proceeded to resort to the common law as an aid in the construction of this provision.

(Citations omitted.) 169 U.S. at 654–55, 18 S.Ct. at 459.

In *Wong Kim Ark,* the Court then traced the United States' reliance on the common law rule of citizenship by birth from its origins in *Calvin's Case.* 77 Eng.Rep. 377, 399 (Exch.Ch. 1608). That case established that a person's status as a natural-born subject[4] requires that (1) the person's birth occur within the bounds of the King's *dominion* and (2) that the parents owe obedience to the King at the time of the child's birth. *Id.* 169 U.S. at 655, 18 S.Ct. at 459. Further, in *Wong Kim Ark* the Court stated:

> The fundamental principle of the common law with regard to English nationality was birth within the allegiance—also called "ligealty," "obedience," "faith," or "power"— of the king. *The principle embraced all persons born within the king's allegiance, and subject to his protection.*

*Id.* (Emphasis added.) Continuing its analysis, the Court noted:

> Mr. Dicey, in his careful and thoughtful Digest of the Law of England with Reference to the Conflict of Laws, published in 1896, states the following propositions....
> "'Natural-born British subject' means a British subject who has become a British subject at the moment of birth. Subject to the exceptions hereinafter mentioned, any person who (whatever the nationality of his parents) is born within the British dominions is a natural-born British subject. This rule contains the leading principle of English law on the subject....."

*Id.* at 657, 18 S.Ct. at 460.[5]

The Court in *Wong Kim Ark* then noted that the above quoted rule was adopted by the English Colonies and was implicitly incorporated by the framers into the original

**4.** "The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government." *Wong Kim Ark,* 169 U.S. at 664, 18 S.Ct. at 459.

**5.** The noted exceptions were: "(1) Any person who (his father being an alien enemy) is born in a part of the British dominions, which at the time of such person's birth is in hostile occupa-

tion, is an alien. (2) Any person whose father (being an alien) is at the time of such person's birth an ambassador or other diplomatic agent accredited to the crown by the sovereign of a foreign state is (though born within the British dominions) an alien." *Id.* at 657–58, 18 S.Ct. at 460. The reason for these exceptions is that a person born under either of these circumstance does not owe allegiance to the sovereign nation in whose territory that person is born.

Constitution: "The same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." 169 U.S. at 658, 18 S.Ct. at 460.

> "Before our Revolution, all free persons born *within the dominions* of the king of Great Britain, whatever their color or complexion, were native-born British subjects; those born out of his allegiance were aliens.... The sovereignty has been transferred from one man to the collective body of the people; and he who before was a 'subject of the king' is now a 'citizen of the state.'" [Quoting *State v. Manual,* (1838) 4 Dev. & B. 20, 26.]
>
> That all children, born *within the dominion* of the United States, of foreign parents holding no diplomatic office, became citizens at the time of their birth, does not appear to have been contested or doubted....

*Id.* 169 U.S. at 664–65, 18 S.Ct. at 462 (emphasis added).

Following an extensive review of the cases and commentaries focusing on the definition of citizenship spanning three centuries,[6] the Court in *Wong Kim Ark* stated: "There is, therefore, little ground for the theory that at the time of the adoption of the fourteenth amendment of the constitution of the United States there was any settled and definite rule ... inconsistent with the ancient rule of citizenship by birth *within the dominion.*" *Id.* at 667, 18 S.Ct. at 464 (emphasis added). In sum, the Court stated that it was "irresistibly" led to conclude that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth *within the territory,* in the allegiance and under the protection of the country...." 169 U.S. at 693, 18 S.Ct. at 474 (emphasis added).[7]

Finally, the Court applied this established common law view to the passage of the Fourteenth Amendment and concluded that:

> In the forefront, both of the fourteenth amendment of the constitution, and of the civil rights act of 1866, the fundamental principle of citizenship by birth within the *dominion* was reaffirmed in the most explicit and comprehensive terms....
>
> As appears upon the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens ... who would thereby have become citizens according to the law existing before its adoption.

*Id.* at 675–76, 18 S.Ct. at 467 (emphasis added).

Writing in a pre-Fourteenth Amendment case,[8] *Inglis v. Sailor's Snug Harbour,* 28

---

6. *Wong Kim Ark* also cites the *Commentaries* of Chancellor Kent, 2 Kent, Comm. (6th Ed.) 39, 258, wherein Chancellor Kent stated: "And if, at common law, all human beings born within the ligeance of the king, and under the king's obedience, were natural-born subjects, and not aliens, I do not perceive why this doctrine does not apply to these United States in all cases in which there is no express constitutional or statute declaration to the contrary." *Wong Kim Ark,* 169 U.S. at 665, 18 S.Ct. at 463.

7. The Court's conclusion accords with the understanding expressed by Congressman Broomall of Pennsylvania, with respect to the nearly identical language adopted as part of the Civil Rights Act of 1866, Rev.Stat. § 1992, ch. 31, 14 Stat. 27 (1866):

> The first provision of the bill declares that all persons born in the United States, and not subject to any foreign Power, are citizens of the United States. As a positive enactment, this would hardly seem necessary. Even as a declaration of existing law, a proposition that at most can only be said to embrace the true meaning of the word "citizen" would seem to find its more appropriate place in the elementary treatises upon law rather than upon the statute books.

Cong. Globe, 39th Congress, 1st Sess. 1262 (1866) (Congressman Broomall). *See also* 4 C. Gordon and S. Mailman, *supra* note 3, §§ 92.-03[1][a], [b]:

> The ancient and indisputable citizenship rule of the British common law was the *jus soli,* under which a person's nationality is determined by the place of his birth.... It is clear, of course, that the American colonies and the nation they ultimately established had accepted the precepts of the English common law, as part of the heritage from the mother country.

8. *See also Gardner v. Ward,* 2 Mass. 244 (1805). The Supreme Judicial Court of Massachusetts, Mr. Justice (afterwards Chief Justice) Sewall, held that the determination of whether a man was a citizen or an alien was "to be governed altogether by the principles of the common law," and "that a man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born. By this circumstance of his

U.S. 99, 3 Pet. 99, 7 L.Ed. 617 (1830), Justice Thompson in his majority opinion states: "It is universally admitted both in English courts *and in those of our own country,* that all persons born within the colonies of North America, while subject to the crown of Great Britain, were natural-born British subjects...." *Id.* at 120, 7 L.Ed. 617 (emphasis added). Justice Story, in his concurrence,[9] elaborates on this proposition further:

> Two things usually concur to create citizenship [by birth]: first, *birth locally within the dominions of the sovereign;* and, second, birth within the protection and obedience, or in other words, within the ligeance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and, consequently, owe obedience or allegiance to, the sovereign....

*Inglis v. Sailors' Snug Harbour,* 28 U.S. 99, 155, 3 Pet. 99, 155, 7 L.Ed. 617 (1830) (Story, J., concurring) (emphasis added).

I provide such extensive detail and quotations from *Wong Kim Ark* and *Inglis* because the majority opinion dismisses out of hand any language from these case as non-dispositive dicta, and states that the dissent selects "ambiguous" phrases and uses them in a "misleading" manner out of context. *See supra* majority opinion at 11403–11405. Contrary to this contention, the terms "territory," "dominion," and "sovereignty" appear dozens of times throughout *Wong Kim Ark* and *Inglis* when interpreting the right to citizenship under the Fourteenth Amendment. These decisions make clear the importance of the common law's interpretation of citizenship as applied under the Fourteenth Amendment, and the determination that citizenship must extend to all persons owing allegiance within the *territory or dominion* of the sovereign nation.

Thus, a careful reading of *Wong Kim Ark* and *Inglis* points to two conclusions. First, the term "in the United States," as used in the Citizenship Clause, means "within the dominion or territory of the United States." Second, the majority opinion directly contradicts the intention of the authors of the Fourteenth Amendment and frustrates the purpose of that amendment, by restricting the definition of natural-born citizen to those persons born in the states of the Union.

The majority's interpretation is also directly at odds with the Supreme Court's decision in the *Slaughter House Cases,* 83 U.S. 36, 16 Wall. 36, 21 L.Ed. 394 (1873), in which the Court examined the meaning and intention of the Citizenship Clause in light of the events that led to its ratification. *Id.* at 71, 21 L.Ed. 394. According to the Supreme Court, one of the main reasons the Citizenship Clause was adopted was to "put[ ] to rest" the notion that "those ... who had been born and resided always in the District of Columbia or in the territories, though within the United States, were not citizens." *Id.* at 72, 21 L.Ed. 394. The Citizenship Clause was adopted after the Civil War precisely to codify the common law and put control of citizenship by birth beyond the power of the legislature and the courts. The Fourteenth Amendment "declares that persons may be citizens of the United States *without regard to their citizenship of a particular state* and it overturns the *Dred Scott* decision by making all persons born within the United States and subject to its jurisdiction citizens of the United States." *Id.* at 73 (emphasis added).

## B.  United States' Dominion and Control

Applying what I believe is proper construction of the Citizenship Clause to the present case, the crucial question is whether between 1898 and 1946 the Philippine Islands were part of the United States' "dominion." Webster's New International Dictionary defines "dominion" as:

> That which is subject to sovereignty or control; specif.; ... Territory governed, or over which authority is exercised; the

---

birth, he is subjected to the duty of allegiance which is claimed and enforced by the sovereign of his native land; and becomes reciprocally entitled to the protection of that sovereign, and to the other rights and advantages which are included in the term 'citizenship.' "

9.  The majority complains that this citation comes from the dissent in *Inglis.* Justice Story dissented from a *different* section of *Inglis.* All of the Justices in *Inglis* agreed on the question at issue in the quoted section. *See, Wong Kim Ark, 169* U.S. at 659, 18 S.Ct. at 460–61.

tract, district, or country, considered as subject; as, the *dominions* of a king.

Webster's New International Dictionary of the English Language 769 (2d ed. 1940).[10]

The majority opinion does not argue that the Philippines were not within the "dominion" of the United States during the territorial period. Our government's conduct toward the Philippines during this period, as well as judicial decisions concerning the Philippines, confirm the obvious: that between December 10, 1989 and July 4, 1946, the Philippines were subject to the *complete sovereignty* of the United States and therefore were within the *dominion* of our nation.

· Congressional enactments during the territorial period made clear that the United States both maintained and exercised sovereignty over the Philippines during the territorial period. For example, Congress created a tripartite system of government in the Philippines, apparently modeled on our own.[11] However, Congress reserved ultimate control over these institutions to the United States, and the United States exercised this control except as to relatively insubstantial matters.

The United States, for example, retained and exercised substantial control over the Philippine executive branch. In 1916, Congress created the office of the Governor General, and vested the office with "supreme executive power." *See* § 21, 39 Stat. at 552. Congress authorized the President of the United States ("the President") to appoint the Governor General, and to "modify or vacate the action" of the Governor General. § 21, 39 Stat. at 552. The Governor General, in turn, was empowered to control all executive departments, to command the Philippine

military, and to veto acts of the Philippine legislature. § 21, 39 Stat. at 552.

Congress reserved and exercised substantial control over the Philippine legislature, as well. Congress required the Philippine legislature to report to Congress all laws enacted by that legislature, and Congress reserved to itself and the President the power to annul those laws. § 19, 39 Stat. at 551; § 2(a)(11), 48 Stat. at 457; § 7(2), 48 Stat. at 461. Furthermore, statutes covering certain subjects could not take effect without the President's affirmative approval.[12] All enactments of the Philippine legislature were required to contain a clause that provided: "By authority of the United States be it enacted by the Philippine Commission...." § 1, 32 Stat. at 692. Moreover, the President appointed the members of the first Philippine legislative body. § 1, 32 Stat. at 691. Even after Congress permitted Filipinos to elect their own legislators, it restricted eligibility for legislative positions to those "owing allegiance to the United States." § 7, 32 Stat. at 694.

Our government also exercised extensive control over the Philippine judiciary. Congress created a judicial system, including a supreme court of the Philippines, § 9, 32 Stat. at 695, and the President was charged with appointing the chief and associate justices of that court, with the advice and consent of the Senate. § 9, 32 Stat. at 695; § 26, 39 Stat. at 555.[13] Furthermore, decisions of the supreme court of the Philippines were, with minor exceptions, reviewable by the Supreme Court of the United States. § 10, 32 Stat. at 695; § 27, 39 Stat. at 555; § 7(6), 48 Stat. at 462.

---

10. The definition of "dominion" contained in the Oxford English Dictionary is substantially the same:

> The territory owned by or subject to a king or ruler, or under a particular government or control. Esp. a country outside England or Great Britain under the sovereignty of or owing allegiance to the English or British crown; *spec. † (a) pl.* the English possessions in America;....

IV Oxford English Dictionary 949 (2d ed. 1989).

11. *See* Philippine Government Act, ch. 1369, 32 Stat. 691 (1902); Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916); Philippine Independence Act, ch. 84, 48 Stat. 456 (1934).

12. *See,* § 13, 32 Stat. at 695–96 (disposition of land); § 10, 39 Stat. at 548 (tariffs, immigration, currency); § 2(a)(9), 48 Stat. at 457 (currency & coinage, imports & exports, and immigration).

13. Judges of the courts "of first instance" (trial courts) were appointed by the civil governor (and later by the Governor General) of the Philippines, by and with the advice and consent of the Philippine Commission. § 9, 32 Stat. at 695; § 26, 39 Stat. at 555. (However, the President appointed the civil governor, Governor General, and members of the Philippine Commission. § 1, 32 Stat. at 691; § 21, 39 Stat. at 552–53.)

Even after Congress in 1934 provided for the creation of a constitutional government in the Philippines, it retained substantial ultimate control over the Philippine "Commonwealth." [14] Congress prescribed in fair detail the provisions of the Philippine constitution,[15] which was required to provide that all citizens of the Philippine Islands *owed allegiance to the United States*, and that every officer of the Philippine Commonwealth, before taking office, declare that "he recognizes and accepts the supreme authority of and will maintain true faith and allegiance to the United States." §§ 2(a)(1) & (2), 48 Stat. at 456.

Even during this period of increasing autonomy, Congress reserved enormous powers to the United States. For example, the President was authorized to veto any amendment to the Philippine constitution, § 7(1), 48 Stat. at 460–61, and retained the power to suspend the effect of any law, contract, or executive order of the Philippine Commonwealth. § 7(2), 48 Stat. at 461. The Philippine Islands' foreign affairs continued to be subject to the United States' "direct supervision and control." § 2(a)(10), 48 Stat. at 457.

In addition to this statutory record of United States sovereignty over the Philippines, numerous decisions have expressly recognized that after Spain ceded the Philippines to this country, those islands became part of the United States' dominion. For example, in *Fourteen Diamond Rings v. United States*, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138 (1901), the Supreme Court observed that upon Spain's cession of the Philippine Islands to the United States, those islands

> came under the *complete and absolute sovereignty and dominion of the United States*, and so became *territory of the United States* over which civil government could be established. The result was the same although there was *no stipulation* that the native inhabitants should be incor-

porated into the body politic, and none securing to them the right to choose their nationality. *Their allegiance became due to the United States*, and they became entitled to its protection.

183 U.S. at 179, 22 S.Ct. at 60 (emphasis added). Even after Congress created the Philippine "Commonwealth" in 1934, the Supreme Court confirmed that the Philippine Islands continued to form part of the United States' "dominion":

> [I]t is contended that the passage of the Philippine Independence Act of March 24, 1934, and the adoption and approval of a constitution for the Commonwealth of the Philippine Islands have created a different situation; .... Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been, and, for a long time, may not be finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory.

*Cincinnati Soap Co. v. United States*, 301 U.S. 308, 319, 57 S.Ct. 764, 769, 81 L.Ed. 1122 (1937) (citation omitted). To the same effect is *Barber v. Gonzales*, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009 (1954):

> From the Spanish cession in 1898 until final independence in 1946, the Philippine Islands were American territory subject to the jurisdiction of the United States. [ ] Persons born in the Philippines during this period were ... entitled to the protection of the United States and conversely owing permanent allegiance to the United States.

347 U.S. at 639 n. 1, 74 S.Ct. at 823 n. 1 (citation omitted).

In sum, these statutes and decisions demonstrate that the United States maintained and exercised sovereignty and control over the Philippine Islands and its inhabitants during the territorial period, and that the

---

**14.** *See* Philippine Independence Act, ch. 84, 48 Stat. 456 (1934).

**15.** Those provisions included (1) recognition of the United States' right to intervene in the governance of the Philippines, § 2(a)(14), 48 Stat. at 457; (2) recognition of the United States' right to expropriate Philippine lands and command the

Philippine armed forces, § 2(a)(12), 48 Stat. at 457; (3) continuing review by the United States Supreme Court of decisions by the courts of the Philippines, § 2(a)(13), 48 Stat. at 457; and (4) continuing reports of all acts passed by the legislature to be reported to Congress, § 2(a)(11), 48 Stat. at 457.

Philippine Islands were "within the dominion of the United States" during the territorial period.[16] Not surprisingly, some scholars writing around the time of our acquisition of the Philippines recognized precisely this outcome. *See, e.g.,* Simeon E. Baldwin, *The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory,* 12 Harv.L.Rev. 393, 406 (1899) ("the XIV Amendment would seem to make every child, of whatever race, born in any of our new territorial possessions [Guam, Puerto Rico, and the Philippines] after they become part of the United States, of parents who are among its inhabitants and subject to our jurisdiction, a citizen from the moment of birth.").

Thus, I conclude that the Philippine Islands were sufficiently under the dominion and control of the United States such that persons born in the Philippines between December 10, 1898 and July 4, 1946 were born "in the United States" within the meaning of the Citizenship Clause.

**C. The Insular Cases**

The majority opinion does not offer an alternate viewpoint of the common law or the history and purpose of the Fourteenth Amendment. Instead, the majority opinion contends that an inquiry into the development of the Fourteenth Amendment is unnecessary, because the Supreme Court determined unequivocally the meaning of the phrase "the United States" as used through-

out the Constitution after it wrote its decision in *Wong Kim Ark.* The majority opinion bases this determination on the doubtful authority of one of a series of Supreme Court decisions referred to as the *Insular Cases. See, e.g., Balzac v. Porto Rico,* 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Dorr v. United States,* 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); and *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *see also Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero,* 426 U.S. 572, 600 n. 30, 96 S.Ct. 2264, 2280 n. 30, 49 L.Ed.2d 65 (1976).

According to the *Insular Cases,* under the judicially-created doctrine of "territorial incorporation," the guarantees provided by the Constitution automatically apply in full force only to "incorporated" territories, i.e., those that Congress designates as destined for statehood.[17] *Flores de Otero,* 426 U.S. at 600 n. 30, 96 S.Ct. at 2280 n. 30. The only exception to this doctrine recognized in the *Insular Cases* is that certain " 'fundamental' constitutional rights" do apply even to inhabitants of "unincorporated territories," i.e., those territories not so designated by Congress as destined for statehood.[18] *Id.*

In the present case, the majority hangs its hat on an isolated reference to the Fourteenth Amendment from a lengthy fifty-seven page opinion in just one of the *Insular Cases,* i.e., *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1900). In

---

**16.** *See also* Joseph R. Hayden, *The Philippines: a Study in National Development,* (New York: Macmillan Co., 1942). Hayden was vice-governor of the Philippine Islands from 1933 to 1935. In his work on the Philippines during the Commonwealth period, he observes that the Philippine Commonwealth was "more completely subject to ultimate Congressional control than an incorporated territory, like Alaska." *Id.* at 763. He also notes that the extent of the United States control over the Philippine Commonwealth far exceeded the control maintained by Britain over the members of British Commonwealth of Nations, which were considered British "dominions." *Id.*

**17.** The majority opinion disavows any reliance on the doctrine of territorial incorporation in its footnote 8 where it states: "We note that the territorial scope of the phrase "the United States" is a distinct inquiry from whether a constitutional provision should extend to a territory ... and we rely on the *Insular Cases* only to determine the meaning of the phrase "in the

United States." This statement does not seem to make sense. The meaning of "in the United States" is not before us as an abstract concept. The issue before us is whether the Citizenship Clause extends to a territory. By disavowing but in effect adopting the reasoning of the *Insular Cases,* the majority opinion holds that Congress may deny citizenship to persons born in the Philippines because the Citizenship Clause only applies to a territory if it has been "incorporated" by statehood. Thus, the majority opinion does in fact rely on the doctrine of territorial incorporation in construing the Citizenship Clause of the Fourteenth Amendment.

**18.** In *Dorr,* the Supreme Court held that the Philippine Islands were such an "unincorporated territory." 195 U.S. at 143, 24 S.Ct. at 810 (Congress has "refrained from incorporating the Philippines into the United States").

*Downes,* the Court was called on to interpret the Revenue Clause of Article I, Section 8 of the Constitution. Specifically, the Court considered "whether the *revenue clauses* of the Constitution extend of their own force to our newly acquired territories" such as Puerto Rico. 182 U.S. at 249, 21 S.Ct. at 772 (emphasis added). In so doing, Justice Brown stated that "[t]he Constitution itself does not answer the question. Its solution must be found in the nature of the government created by that instrument ... in the practical construction put upon it by Congress, and in the decisions of this court." *Id.* Relying heavily on the particular history of the Revenue Clause, the Court determined that, based on the doctrine of "territorial incorporation," the Revenue Clause does not apply to unincorporated territories.

*Downes* only interpreted the Revenue Clause. Yet, the majority opinion, without considering whether citizenship is a fundamental right, decides that the Fourteenth Amendment Citizenship Clause does not apply to unincorporated territories such as the Philippines. This determination is based on a brief and isolated reference in *Downes* to the Thirteenth and Fourteenth Amendments. Regarding the Thirteenth Amendment, the Court in *Downes* notes that it applies on its face not only to the United States, but to any place within the United States' jurisdiction ("within the United States, or in any place subject to their jurisdiction"). *Id.* at 251, 21 S.Ct. at 773. The Court, in two sentences, then contrasts the Thirteenth and Fourteenth Amendments.

> Upon the other hand, the 14th Amendment, upon the subject of citizenship, declares only that "all persons born or naturalized *in the United States,* and subject to the jurisdiction thereof, are citizens of the United States and of the *state* wherein they reside." Here there is a limitation to persons born or naturalized in the United States, which is not extended to persons born in any place "subject to their jurisdiction."

*Id.* (Emphasis in original.) Based on these brief references in *Downes* to the Thirteenth and Fourteenth Amendments, the majority opinion concludes that the Fourteenth Amendment Citizenship Clause applies only to the states of the Union, not to unincorporated territories such as the Philippines.

The majority opinion's conclusion is incorrect for two reasons. First, the majority opinion's reliance on language in *Downes* which discusses the Thirteenth and Fourteenth Amendments is misplaced because *Downes* fails to address the dispositive issue now before this Court. The dispositive issue is: what does the phrase "*in* the United States" mean in the context of the Fourteenth Amendment. The dispositive issue in *not* whether the Fourteenth Amendment applies to persons born outside of the United States but otherwise subject to its jurisdiction. In short, regarding the Fourteenth Amendment, *Downes* only restates that a person must be born *in the United States*. *Downes* does not define for Fourteenth Amendment purposes what "*in* the United States" means.

Second, the majority opinion's interpretation of the Citizenship Clause overlooks the very advice given at the outset of *Downes* by Justice Brown. His advice directs us to look to the "nature of government created by" the Constitution, as well as "the decisions of this court." *Downes,* 182 U.S. at 249, 21 S.Ct. at 772. In the present case, this can only be done by examining the history and common law behind the *Citizenship Clause,* not by looking to historical information concerning an entirely different provision—the *Revenue Clause.* Thus, by contravening the guidance provided in *Downes,* the majority opinion mistakenly resorts to the history of the Revenue Clause to determine the meaning and territorial scope of the Citizenship Clause.

Moreover, it is important to remember that the *Insular Cases* are a product of their time, a time when even the Supreme Court based its decisions, in part, on fears of other races. *See, e.g., Downes,* 182 U.S. at 282, 21 S.Ct. at 785 (racial differences are among the difficulties Congress must face in annexing distant territories). Justice Harlan warns in his vigorous dissent in *Downes* that the principles announced in that case could work "a radical and mischievous change in our system of government." *Downes,* 182 U.S. at 379, 21 S.Ct. at 822 (Harlan J., dissenting). "The idea," Justice Harlan wrote, "that this coun-

try may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces—the people inhabiting them to enjoy only such rights as Congress chooses to accord them—is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution." *Id.*

The Supreme Court has explicitly directed us not to expand the holdings or reasoning of the *Insular Cases.* In *Reid v. Covert,* the Supreme Court stated:

> The *Insular Cases* can be distinguished from the present case in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions wherein as here the *basis for governmental power is American citizenship....* Moreover, it is our judgment that neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.

354 U.S. 1, 14, 77 S.Ct. 1222, 1229, 1 L.Ed.2d 1148 (1957) (plurality opinion) (footnotes omitted).[19]

Thus, it is problematic for the majority opinion to rely *solely* on the *Insular Cases* to determine domestic constitutional rights other than those specifically addressed by those cases. I emphasize that neither *Downes* nor any of the other *Insular Cases* purport to address the territorial scope of the Citizenship Clause. As explained above, the history and purpose of the Fourteenth Amendment should be viewed from the perspective explicated at length in *Wong Kim Ark,* a case which focuses on the meaning of citizenship.

In sum, the majority opinion is the first to apply the doctrine of "territorial incorporation" as expressed in *Downes* and the other *Insular Cases* to determine the meaning of "the United States" as used elsewhere in the Constitution. Sadly, the majority opinion is the first to deny the benefits of the Citizenship Clause to persons born in a United States territory.

## D. Citizenship as a Fundamental Right

Finally, even if the reasoning of the *Insular Cases* were applicable to the present case, I believe that the majority erred in *not* finding that the right to citizenship by birth is among those "fundamental constitutional rights [that] apply by their own force," according to the *Insular Cases,* throughout the dominion of the United States. *Flores de Otero,* 426 U.S. at 600 n. 30, 96 S.Ct. at 2280 n. 30.

In *Dorr,* the Court explained that certain constitutional provisions would apply of their own force even in the unincorporated territories:

> Doubtless Congress, in legislating for the territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exist by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions.

*Dorr,* 195 U.S. at 146, 24 S.Ct. at 811 (quoting *Church of Jesus Christ of Latter Day Saints v. United States,* 136 U.S. 1, 44, 10 S.Ct. 792, 803, 34 L.Ed. 478 (1890)).

The majority opinion, when it concludes that birth in the Philippines does not give rise to citizenship under the Fourteenth Amendment, ignores the requirement to determine whether citizenship is a "fundamental right." *See supra* majority opinion at

---

19. *See also Harris v. Rosario,* 446 U.S. 651, 653, 100 S.Ct. 1929, 1930–31, 64 L.Ed.2d 587 (1980) (Marshall, J., dissenting) ("the present validity of those decisions [in the *Insular Cases* ] is questionable"); *Torres v. Puerto Rico,* 442 U.S. 465, 475–76, 99 S.Ct. 2425, 2432, 61 L.Ed.2d 1 (1979) (Brennan, J., concurring) (questioning the "va-

lidity of the old cases such as *Downes v. Bidwell, Dorr v. United States,* and *Balzac v. Porto Rico*") (citations omitted); and *Flores de Otero,* 426 U.S. at 600 n. 31, 96 S.Ct. at 2280 n. 31 (stating that *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) overruled the *Insular Cases* ).

1458–59, fn. 8. As discussed above, the *Insular Cases* hold that fundamental constitutional rights cannot be abridged in the United States territories. There is no dispute that the Philippines were a United States territory. Therefore, under the *Insular Cases* a court *must* decide if citizenship is a fundamental right *as well as* deciding whether citizenship is guaranteed under the Fourteenth Amendment to persons born in the Philippines.

Among those fundamental constitutional protections that the Supreme Court has held or otherwise indicated apply of their own force to unincorporated territories are those embodied in the First Amendment Free Speech Clause, the Fourth Amendment, the Due Process Clause, and the Equal Protection Clause. *See Harris,* 446 U.S. at 653, 100 S.Ct. at 1930–31 (listing cases); *Torres,* 442 U.S. at 469–70, 99 S.Ct. at 2428–29 (same). The only constitutionally protected individual rights that the Supreme Court has found inapplicable to unincorporated territories are the rights to trial by jury and to a grand jury indictment. *See Dorr,* 195 U.S. at 149, 24 S.Ct. at 813 (no right to trial by jury in the Philippines); *Balzac,* 258 U.S. at 311, 42 S.Ct. at 348 (no right to trial by jury in Puerto Rico).

The Fourteenth Amendment guarantee of citizenship to those born "in the United States" is precisely the type of "fundamental" restriction on government conduct that would apply of its own force under the *Insular Cases.* First, the rule of citizenship by birth in the territory of the sovereign predated not only its codification in our Constitution, but the birth of this nation itself. *See Wong Kim Ark,* 169 U.S. at 658. Thus, the right to citizenship by birth in the territory, even before it was "expressed in so many words in the Constitution," *Dorr,* 195 U.S. at 147, was a right respected at common law in this country, in England, and indeed through much of Europe. *See Wong Kim Ark,* 169 U.S. at 666 ("the rule in Europe generally ... [was that] 'mere birth within the realm gives the rights of a native-born citizen.' ").

It is difficult to conceive of a right more fundamental, or more jealously guarded, than the right of citizenship by birth affirmed in the Citizenship Clause. Fourteenth Amendment citizenship cannot be revoked for any reason without the consent of the citizen. *See Afroyim,* 387 U.S. at 267–68 ("Citizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power.... Our holding does no more than [recognize each citizen's] constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship.").

In contrast to the absolute nature of Fourteenth Amendment citizenship, other constitutional rights, such as those protected by the First Amendment, may be abridged if the government can demonstrate their restriction is necessary to further a compelling state interest. *See, e.g., Burson v. Freeman,* 112 S.Ct. 1846, 1851 (1992). Because First Amendment rights are among those fundamental limitations on government that apply of their own force, *see Torres,* 442 U.S. at 469, certainly the more absolute right of citizenship by birth must also apply of its own force.

Furthermore, our right to citizenship by birth outweighs even our right to life. For example, even when Congress could impose capital punishment for wartime desertion, it could not revoke United States citizenship as punishment for that same crime. *See Trop v. Dulles,* 356 U.S. 86, 99–102 (1958) (death penalty is still widely accepted punishment, but expatriation "is a form of punishment more primitive than torture").

Thus, the majority opinion's application of the doctrine of territorial incorporation to the present case, without also considering whether citizenship is a fundamental right, incorrectly applies the law of the *Insular Cases* on which the majority opinion so heavily relies. And, the majority opinion's application of the doctrine of territorial incorporation abrogates Plaintiffs' fundamental right to United States citizenship by virtue of their birth in a territory of the United States—the Philippines.

### CONCLUSION

A review of relevant authorities ineluctably leads me to conclude that the District Court erred in dismissing Plaintiffs' complaints for

failure to state a claim, and that the majority opinion erroneously affirms that dismissal. Persons born in the Philippines during the territorial period indisputably were born within the dominion of the United States, and therefore were born "in the United States" within the meaning of the Citizenship Clause. Moreover, neither congressional power to control naturalization and regulate territories, nor the now disfavored doctrine of territorial incorporation, authorizes this Court to deny to these Plaintiffs what the people of this country sought to ensure under the Fourteenth Amendment—the inviolability of the fundamental right to citizenship by birth.