**CABEBE v. ACHESON, Secretary of State.**

No. 12333.

United States Court of Appeals
Ninth Circuit.

June 23, 1950.

Rehearing Denied Aug. 3, 1950.

796

N. W. Y. Char, Yasutaka Fukushima and Sau Ung Loo Chan, all of Honolulu, T. H., for appellant.

Ray J. O'Brien, U. S. Atty., Howard K. Hoddick, Asst. U. S. Atty., Honolulu, T. H., Frank J. Hennessy, U. S. Atty., and Macklin Fleming, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Arcadio Cabebe was born in the Philippine Islands in 1910, lawfully entered the Territory of Hawaii in 1930 where he has resided ever since, and in 1949 petitioned the United States District Court for such Territory to have his status declared to be that of a national of the United States entitled to certain rights and privileges which he alleged had been wrongfully denied him. Section 503[1] of the Nationality Act of 1940 authorizes such suit. The district court ruled that Cabebe is an alien of the United States and thereupon denied the relief prayed for. 84 F.Supp. 639. Cabebe appeals.

In 1949 appellant applied for the issuance of a United States passport permitting his entry into Guam.[2] The application was

1. 54 Stat. 1171, 8 U.S.C.A. § 903. In so far as is pertinent, Section 503 provides as follows: "If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for

the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. * * *"

2. Under State Department regulations to be found in 22 C.F.R. (1949 Ed.) §§ 53.1–53.9, which were promulgated under 22 U.S.C.A. § 223, United States citizens and persons who owe allegiance to the United States are required to have passports to enter the Island of

denied on the single ground that by virtue of and since the July 4, 1946, Presidential proclamation of Philippine independence[3] in pursuance of the Philippine Independence Act of 1934[4] as amended appellant became and is an alien of the United States and hence is not entitled to a United States passport.[5] See 22 U.S.C.A. § 212, which provides: "No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States."[6]

Appellant here does not claim American citizenship, and no one owes American allegiance save either a citizen or a national. The statute covering passports is limited to persons owing allegiance to the United States. The privilege, therefore, of a passport to Guam depends upon whether this applicant is a United States national. We shall hereinafter see that Cabebe was a United States national immediately prior to Philippine independence and that immediately thereafter, the fact upon which such status (inclusive of allegiance) was based having ceased to exist, the inclusive status ceased to exist with it.

Appellant contends that his United States nationality was not affected by the proclamation of Philippine independence and hence that he is entitled to the passport denied to him.

■ "Nationality" is a term denoting a relationship between an individual and a nation "involving the duty of obedience [or "allegiance"] on the part of the subject and protection on the part of the state."[7] And, it is domestic rather than international law which in most circumstances determines acquisition or loss of nationality.[8] United States nationality depends primarily upon the place of birth, the common law principle of jus soli having been embodied in the Fourteenth Amendment of the Constitution of the United States. Nationality may also be acquired by naturalization and lost by expatriation.

■ With the cession of populated areas by the Crown of Spain to the United States, however, persons collectively became nationalized but not naturalized, Spanish subjects residing in ceded territory becoming nationals of the United States unless it was otherwise provided by treaty.[9] Accordingly, it was realized that while all citizens of the United States were nationals, not all nationals were citizens. A hybrid

---

Guam, even though Guam is a possession of the United States.

3. 60 Stat. 1352, Proclamation No. 2695, 48 U.S.C.A. § 1240 note.

4. Act of March 24, 1934, 48 Stat. 456, 48 U.S.C.A. § 1231 et seq.

5. If before Philippine independence appellant was a national of the United States, he of course owed allegiance to the United States and hence was then eligible for a passport. Accordingly, it is alleged in the petition that appellant had worked on Guam during the period from May, 1946, to August 11, 1947. That he could do so presupposes that he had been issued a passport as a national. However, the only fact recited in appellant's petition to base his claim to United States nationality prior to Philippine independence is that he was born in the Philippine Islands in 1910. As will hereinafter be evident from our discussion, persons born in those islands subsequent to their cession to the United States, even though they may be "natives," are not necessarily nationals of the United States

or citizens of the Philippines. However, at pre-trial (or what amounted to pre-trial) the government did not dispute but that appellant was born a national of the United States. The case was tried on that basis.

6. R.S. § 4076 was amended to read as quoted in the text above by the Act of June 14, 1902, 32 Stat. 386. R.S. § 4076 theretofore read as follows: "No passport shall be granted or issued to or verified for any other persons than citizens of the United States."

7. VI Temple Law Quarterly 451, 478 (1932). "National" is defined in 8 U.S.C.A. § 501(a) as a "person owing permanent allegiance to a state." See Koessler, "Subject," "Citizen," "National," and "Permanent Allegiance," 56 Yale Law Journal 58 (1946) for a criticism of defining nationality in terms of "permanent allegiance."

8. See Vol. III, Hackworth, Digest of International Law (1942), 1.

9. See Boyd v. Thayer, 1892, 143 U.S. 135, 162, 12 S.Ct. 375, 36 L.Ed. 103.

status appeared, the so-called "non-citizen national".

The Nationality Act of 1940 defines the phrase "national of the United States" as meaning "(1) a citizen of the United States, or (2) a person who, though not a citizen of the United States, owes permanent allegiance to the United States. It does not include an alien." 8 U.S.C.A. § 501(b).[10]

The archipelago known as the Philippine Islands was ceded to the United States by Spain effective April 11, 1899.[11] Treaty provisions gave the then Spanish subjects who were "natives of the Peninsula" (i. e., born in Spain) residing in the ceded territory the option of retaining Spanish nationality either by removing therefrom or by remaining therein and making a prescribed declaration of desire to preserve such allegiance before a court of record within a certain time. It was further declared in the same Treaty that the "civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress" of the United States. These treaty provisions have been interpreted as effecting a transition nolens volens of Spanish subjects inhabiting the Islands at the effective date of such treaty into United States nationals except for "natives of the Peninsula" who acted upon the option to preserve their Spanish nationality. See Fourteen Diamond Rings v. United States, 1901, 183 U.S. 176, 179, 22 S.Ct. 59, 46 L.Ed. 138.

By the Act of July 1, 1902,[12] "all inhabitants of the Philippine Islands continuing to reside therein, who were Spanish subjects on" April 11, 1899, "and then resided in said Islands, and their children born subsequent thereto" were deemed and held to be "citizens of the Philippine Islands and as such entitled to the protection of the United States" except such as pursuant to the Treaty of Paris were authorized and had elected to preserve their allegiance to the Crown of Spain. To such provisions Congress in 1912 added a proviso authorizing the enactment of a naturalization law by the Philippine legislature to permit the acquisition of Philippine citizenship by certain enumerated classes of non-citizens.[13] The 1902 provisions and the 1912 proviso were restated and continued in Section 2 of the Jones or Autonomy Act of August 29, 1916.[14] The Philippine legislature enacted a naturalization law on March 26, 1920, which, conforming to the above mentioned proviso, provided in part as follows: "*Who may become Philippine citizens.*—Philippine citizenship may be acquired by: (a) natives of the Philippines who are not citizens thereof under the Jones law [act of August 29, 1916] [15] ; (b) natives of the other insular possessions of the United States; (c) citizens of the United States, or foreigners who under the laws of the United States may become citizens of said country if residing therein."[16]

The preamble to the Jones Act, supra, the organic act with respect to Philippine independence, declared the following: "[I]t is, as it has always been, the purpose of the people of the United States to withdraw

---

10. See also 22 U.S.C.A. § 212 and 8 U.S.C.A. § 721 for other statutory recognition of "non-citizen nationals".

11. Treaty of Paris, December 10, 1898, 30 Stat. 1754. The "Phillippines" as defined by § 1 of the Act of August 29, 1916, 39 Stat. 545, 48 U.S.C.A. § 1001, embraces not only the territory ceded to the United States by the Treaty of Paris but also those islands with which the treaty between Spain and the United States concluded at Washington on November 7, 1900, was concerned. See 31 Stat. 1942.

12. 32 Stat. 692.

13. Act of March 23, 1912, 37 Stat. 77.

14. 39 Stat. 545, 546, 48 U.S.C.A. § 1002.

15. "This class refers to native-born Filipinos who were away from the Philippines on the eleventh day of April, 1899, but who had lost their Spanish citizenship under Article 2 of the Royal Decree of May 11, 1901, approved and accepted by the War and State Departments of the United States, as not violating the provisions of the Treaty of Paris, or infringing upon the rights of the United States, and have not become citizens of the countries in which they were residing at the time." Sinco, Philippine Government and Political Law, 5th Ed., p. 345.

16. Quoted from Vol. III, Hackworth, Digest of International Law (1942) 136.

their sovereignty over the Philippine Islands and to recognize their independence as soon as a stable government can be established therein; * * *." In pursuance of this policy Congress passed the Philippine Independence Act, Tydings-McDuffie Act, of 1934,[17] which stated the procedure by which the complete independence of the Philippine Islands was to be accomplished. In short, it authorized a constitutional convention to draft a constitution for the government of the newly named Commonwealth of the Philippine Islands, specified certain required provisions, and provided that after the President of the United States certified its conformance thereto the proposed constitution be submitted for ratification to Philippine voters. It was further declared that on July 4th next following the expiration of a period of 10 years from the date of inauguration of the new government under such constitution, the President of the United States would proclaim the complete independence of the Philippine Islands and the people thereof. By its terms the Act was not effective until accepted by concurrent resolution of the Philippine legislature or by a convention called for the purpose of passing upon such question. As of the date of such acceptance (which occurred in fact on May 1, 1934), it was provided in Section 8(a) (1) of the Act[18] that "[f]or the purposes of the Immigration Act of 1917, the Immigration Act of 1924 [with an exception not pertinent here] * * *, this section, and all other laws of the United States relating to the immigration, exclusion, or expulsion of aliens, citizens of the Philippine Islands who are not citizens of the United States shall be considered as if they were aliens." Compare Del Guercio v. Gabot, 9 Cir., 1947, 161 F.2d 559.

On July 4, 1946, as above stated, after all of the conditions precedent to independence stated in the Independence Act of 1934 had been met and the people of the Philippines had "clearly demonstrated their capacity for self-government," the President of the United States proclaimed that the "United States of America hereby withdraws and surrenders all rights of possession, supervision, jurisdiction, control, or sovereignty now existing and exercised by the United States of America in and over the territory and people of the Philippines" and that he for the United States thereby recognized "the independence of the Philippines as a separate and self-governing nation" and acknowledged "the authority and control over the same of the government instituted by the people thereof, under the constitution now in force." 60 Stat. 1352, 1353. A treaty to such effect was entered upon with the Republic of the Philippines.[19]

The constitution drafted, certified, and ratified in conformity with the Independence Act of 1934, under which the government of the Commonwealth of the Philippines operated, thus continued in force for the independent Republic of the Philippines. It provides that the following persons are "citizens of the Philippines: (1) Those who are citizens of the Philippine Islands at the time of the adoption of this Constitution. (2) Those born in the Philippine Islands of foreign parents who, before the adoption of this Constitution, had been elected to public office in the Philippine Islands. (3) Those whose fathers are citizens of the Philippines. (4) Those whose mothers are citizens of the Philippines and, upon reaching the age of majority, elect Philippine citizenship. (5) Those who are naturalized in accordance with law." It is not disputed but that appellant was a citizen of the Philippine Islands at the time of the adoption of such constitution. Hence he was a citizen of the Philippines thereunder. See footnote 5, ante.

Filipinos were not made citizens of the United States by the Treaty of Paris. And,

---

17. See footnote 4, ante. The Hare-Hawes-Cutting Act of 1933, 47 Stat. 761, 48 U.S.C.A. § 1231 et seq., differed only in minor respects from the Tydings-McDuffie Act of 1934, but it never became effective because of Philippine non-acceptance.

18. 48 Stat. 456, 462, 48 U.S.C.A. § 1238 (a) (1).

19. Treaty of July 4, 1946, effective October 22, 1946, 61 Stat. 1174.

they have never been collectively naturalized by legislation as, for example, in the case of Puerto Ricans.[20]

Until July 2, 1946, Filipinos (except for the narrow class mentioned below which did not include appellant) were not eligible for naturalization as citizens of the United States. Although by the Act of June 29, 1906,[21] naturalization laws of the United States were made applicable to and were declared to authorize "the admission to citizenship of all persons not citizens who owe permanent allegiance to the United States, and who may become residents of any State or organized Territory of the United States * * *," it has been ruled that Filipino-non-citizen-nationals were not eligible for naturalization because of racial limitations on the right thereof.[22] See Toyota v. United States, 1925, 268 U.S. 402, 45 S.Ct. 563, 69 L.Ed. 1016. During World War I, the admission to citizenship of Filipinos who had served honorably in the armed forces of the United States for a requisite period was authorized.[23] On July 2, 1946, Congress declared[24] that the "right to become a naturalized citizen * * * shall extend * * * to—* * * Filipino persons or persons of Filipino descent," and amended[25] the Nationality Act of 1940 so as not to require certificates of arrival or declarations of intention "of Filipino persons or persons of Filipino descent who are citizens of the Commonwealth of the Philippines on the date of the enactment of this section, and who entered the United States prior to May 1, 1934, and have since continuously resided in the United States." We assume that under such provisions appellant is eligible for naturalization, if otherwise qualified.[26] Compare Applica-

tion of Viloria, D. C., Hawaii, 1949, 84 F. Supp. 584.

█ It is well established that the United States has the power to acquire territory as a necessary and proper adjunct of sovereignty and of the power to declare and carry on war and to make treaties. See American Insurance Co. v. Canter, 1828, 1 Pet. 511, 26 U.S. 511, 7 L.Ed. 242; Fleming v. Page, 1852, 9 How. 602, 50 U.S. 602, 13 L.Ed. 276. The Supreme Court has declared: "The incidents of these powers are those of national sovereignty, and belong to all independent governments. The power to make acquisitions of territory by conquest, by treaty, and by cession, is an incident of national sovereignty." Mormon Church v. United States, 1890, 136 U.S. 1, 42, 10 S.Ct. 792, 802, 34 L.Ed. 481. "By the law of nations, recognized by all civilized states, dominion of new territory may be acquired * * * by cession or conquest." Jones v. United States, 1890, 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691. And, the "right to acquire territory involves the right to govern and dispose of it [i. e., relinquish sovereignty over it]." De Lima v. Bidwell, 1901, 182 U.S. 1, 196, 21 S.Ct. 743, 753, 45 L.Ed. 1041; United States Constitution, Article IV, Section 3, Clause 2.

▪ █ As we have set out above, the Philippine Islands came to the United States by cession. And, by such acquisition many individuals became nationals of the United States. Later, the United States relinquished its sovereignty over them and their country. It follows that Filipino nationals of the United States inhabiting the Islands at the date of such relinquishment lost the status of nationality. The narrower question fol-

---

20. See 8 U.S.C.A. § 602 and note.

21. 34 Stat. 596, 606; see later enactment, 54 Stat. 1137, 1148, 8 U.S.C.A. § 721.

22. See 8 U.S.C.A. § 703 note.

23. 40 Stat. 542; see later enactment, 54 Stat. 1137, 1140, 8 U.S.C.A. § 703.

24. 60 Stat. 416, 8 U.S.C.A. § 703.

25. 60 Stat. 417, 8 U.S.C.A. § 721a.

26. Appellant, it seems, had pending in the United States District Court for

the Territory of Hawaii a petition for naturalization in which he alleged under oath that he was a citizen of the Republic of the Philippines. The district court in its "Memorandum Decision" herein, 84 F.Supp. 639, 640, remarked: "To remove the inconsistency and because it appeared that his naturalization petition would not be successful in the face of a moral turpitude charge, the petitioner during an interruption in this case withdrew his naturalization petition."

lows: Does such loss also occur as to Filipino-nationals of the United States domiciled in the United States?

We find no solution to the question in the fact that such individuals became citizens of the Philippines. While Congress, by declaring that such persons became Philippine citizens, contributed to the national dignity of the Philippine people, the status had no international effect prior to the relinquishment of United States sovereignty but rather served a useful internal American function. The status of United States nationality for Filipinos was the direct result of the United States' assumption of sovereignty over the Islands. When the United States relinquished its sovereignty, there remained no basis for such status.

The United States had it desired it, could have provided that Filipinos permanently residing in the United States would not lose their United States nationality upon the recognition of Philippine independence. There is a precedent. By the Treaty of Paris[27] Spain relinquished her sovereignty over Cuba and the people thereof just as in 1946 the United States surrendered sovereignty over the Philippines and the people thereof. The situations are comparable but of course different in motivation. By the Royal Decree of May 11, 1901 (see footnote 15, ante), Spain declared that: "Natives of the territories ceded or relinquished who at the date of the exchange of ratifications of the treaty of the 10th of December, 1898, as aforesaid, were residing outside of the country of their birth and who at the time of the promulgation of this decree are found to be inscribed in the registers of the legations or consulates of Spain abroad, or who were holding public office under the Spanish administration or were domiciled within the actual dominions of Spain, shall be held to have retained their Spanish citizenship, unless within the period of a year from this date they shall make an express declaration to the contrary before the proper authorities." Such proclamation was necessary only if the effect of Spain's relinquishment of sovereignty was loss of Spanish nationality by natives not then residing in the territory relinquished. The question here is, What did the United States intend as to Filipinos so situated?

The question is not directly answered (but, as we think, it was inferentially answered) by the Philippine Independence Act of 1934, the Presidential proclamation of Philippine independence or the Treaty of July 4, 1946, with the Republic of the Philippines. While there is no special reference of inclusion or exclusion in any of these acts to Filipinos who were no longer residing in the Islands on the date of their independence, it was, from the ceding from Spain, contemplated and finally accomplished that the United States would surrender all sovereignty "over the territory and the people of the Philippines". In the light of the undeviating non-imperialistic policy of the government of the United States, it seems to us that the expression "people of the Philippines" is all-inclusive excepting only those who have by their own volition taken authorized steps to separate themselves from a national relation to the government of the Philippines. All of the Congressional acts are consistent with this interpretation.

First, shortly after the formal adoption of the Philippine constitution by vote of the Philippine people, Congress provided by legislation for the return at government expense to the Philippines of any native Filipino residing in the continental United States upon proper application for such benefits.[28] The limited time in which to apply was subsequently extended.[29] Later the basic provision was re-enacted to include any native Filipino residing either in the continental United States or in any organized Territory.[30]

Second, Congress saw fit to authorize the naturalization of all Filipino persons and persons of Filipino descent. See footnotes 24 and 25, ante.

27. See footnote 11, ante.
28. Act of July 10, 1935, 49 Stat. 478.

29. Act of June 4, 1936, 49 Stat. 1462; Act of May 14, 1937, 50 Stat. 165.
30. Act of July 27, 1939, 53 Stat. 1133.

Third, the Congressional Appropriation Acts require for the payment of any part of an appropriation to an employee of the United States government that he be a citizen of the United States or eligible for citizenship (provided he has filed a declaration of intention) or owe allegiance to the United States. Congress has specifically declared, however, that such condition is not applicable to citizens of the Republic of the Philippines.[31]

Finally, the provisions of the Treaty dated July 4, 1946, entered upon by the United States and the Republic of the Philippines guarantee that " * * * all existing property rights of citizens and corporations of the United States of America in the Republic of the Philippines and of citizens and corporations of the Republic of the Philippines in the United States of America shall be acknowledged, respected and safeguarded to the same extent as property rights of citizens and corporations of the Republic of the Philippines and of the United States of America respectively."[32] There is nothing in the treaty touching personal civil rights or privileges or status.

■ From the foregoing it is our conclusion that the United States government intended the status of Filipinos, regardless of domicile or place of residence at the date of Philippine independence, to be entirely separate from any phase of adherence to the United States.

We hold that Cabebe is not a national of the United States (he does not claim citizenship); therefore, he is an alien and under the restrictive law we have heretofore adverted to he is not entitled to any relief upon his petition.

Affirmed.

31. See Appropriations Act of July 30, 1947, 61 Stat. 608; Appropriations Act of April 20, 1948, 62 Stat. 193; Appropriations Act of August 24, 1949, 81st Cong., 1st Sess., Public Law 266, H.R. 4177, 63 Stat. 661.

32. 61 Stat. 1174, 1176.