

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1998

# United States v. Kole

Precedential or Non-Precedential:

Docket 96-5457

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Kole" (1998). *1998 Decisions.* Paper 285.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/285

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5457

UNITED STATES OF AMERICA

v.

AGNES KOLE, aka Joy, Zaima Soto Muwanga

Agnes Kole,

      Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
Civil Action No. 93-cr-00426-1
(District Judge: Honorable John C. Lifland)

Argued: June 26, 1998

Before: GREENBERG, ALITO and MCKEE, Circuit Judges.

(Filed December 29, 1998)

      Donna R. Newman, Esq. (Argued)
      3163 Kennedy Boulevard
      Jersey City, NJ 07306

      Attorney for Appellant

      George S. Leone, Esq.
      Amanda Haines, Esq. (Argued)
      Office of United States Attorney
      970 Broad Street
      Room 700
      Newark, NJ 07102

      Attorney for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Agnes Kole pled guilty to violating 21 U.S.C. SS 952(a), 960(a)(1), and 963 based upon her involvement in a conspiracy to import heroin into the United States from Thailand. Thereafter, the government filed an enhanced penalty information under 21 U.S.C. S 851(a) in an effort to enhance Kole's sentence based upon a prior felony drug conviction in the Philippines. The district court granted the requested enhancement, and Kole appeals. She claims that the enhancement was improper because she was denied effective assistance of counsel in the Philippines, and because the Philippine legal system does not recognize the right to a jury trial. For the reasons that follow, we will affirm.

I. Background

A. The Prior Conviction in the Philippines

On December 8, 1991, Kole, four other females, and a male named Lazarus Iwuchukwu ("Ike") were arrested in an apartment in a city in the Philippines. Ike was Kole's fiance. Kole and Ike lived in the apartment, but all six were charged with conspiracy to prepare, package and repackage heroin in violation of Philippine law. Police made the arrest after a drug courier named Jamie Williams lead them to Kole's apartment. Williams had been arrested in Manila as she was boarding a flight bound for Chicago with a false-bottomed suitcase containing approximately five kilograms of heroin.

When police and Williams arrived at the condominium complex where Kole and Ike lived, the owner of the complex consented to a search and police entered Kole's apartment along with Williams. Once inside, the police discovered a blue suitcase containing heroin. Kole and Ike were captured after they tried to escape by jumping from a second story terrace. Several women who were present in the apartment

2

were also arrested and all were charged with violating Philippine law.

The defendants, who were represented by the same attorney, entered pleas of not guilty and proceeded to trial before a judge in accordance with Philippine law. At that trial the police testified that the women who were arrested with Kole were all squatting around a suitcase and filling it with heroin when police entered. Kole testified in her own behalf. She stated that she and Ike had been awakened by a loud noise coming from the living room. According to Kole, Ike had peered from behind the door of the bedroom to find out what was going on when he saw a man with a gun who Ike claimed was trying to kill them. Kole testified that she and Ike attempted to escape by jumping from the second-floor terrace, but they were apprehended and placed under arrest. She insisted that she had never seen Williams before, and that the suitcase with the heroin had never been in her possession. The defendants also offered testimony that police had told them that they had to pay a bribe of $100,000 or the police would have Williams testify that the heroin was found in Kole and Ike's apartment.

Despite the defense testimony, Judge Felix of the Regional Trial Court of the Philippines found both Ike and Kole guilty as charged though he acquitted everyone else.

B. The Current Conviction, and Sentence

In the instant case, Kole and a coconspirator were apprehended in New Jersey and charged with attempting to import heroin. Kole subsequently pled guilty to one count of conspiring to import 3.5 kilograms of heroin into the United States in violation of 21 U.S.C. S 942(a). Following the change of plea proceeding, the government filed an information under 21 U.S.C. S 851(a) in an effort to enhance Kole's sentence to a term of imprisonment of at least 20 years based upon her drug conviction in the Philippines.

Kole argued that 21 U.S.C. S 851(c)(2) precluded the court from using the Philippine conviction to enhance her sentence because she had been denied a jury trial in the Philippines, and because her defense counsel there labored

3

under a conflict of interest that caused her to be denied effective assistance of counsel. Since S 851(c)(2) expressly bars consideration of any prior conviction that "was obtained in violation of the Constitution of the United States," Kole asserted that the sentencing court could not apply the mandatory minimum for repeat felony drug offenders contained in 21 U.S.C. S 960(b)(1)(A).

The district court held a sentencing hearing, and scrutinized Judge Felix's opinion. The district court concluded that both of Kole's assertions were within the scope of the collateral attack allowed under 21 U.S.C. S 851(c)(2), but that Kole had not satisfied her burden of proof as to either claim. Accordingly, the court ruled that the Philippine conviction was a prior drug felony for purposes of sentencing, and sentenced Kole to the mandatory minimum period of incarceration (20 years) under 21 U.S.C. S 960(b)(1).1 This appeal followed.

We have appellate jurisdiction pursuant to 28 U.S.C. S 1291. Our standard of review is plenary. See United States v. Murray, 144 F.3d 270 (3d Cir. 1998) (citing United States v. Woods, 986 F.2d 669, 673 (3d Cir. 1993).

_____

1. Although we refer to the mandatory minimum sentence under 21 U.S.C. S 960 as an enhancement, we note that Kole's offense level was calculated as 37, and she was in criminal history category I. Therefore, the "normal" sentencing range under the Guidelines would have been 210 to 262 months incarceration even without a mandatory minimum sentence of 20 years. Ironically, the sentence that Kole actually received pursuant to the enhancement of 21 U.S.C. S 851 (240 months) was in the middle of the range that would have governed her sentence without the prior conviction in the Philippines. However, that does not alter our analysis of the issues Kole raises in this appeal. Had the district court not imposed the mandatory minimum the Guidelines would have allowed for a sentence of 210 months instead of the 240 months she received. Moreover, the district court could have considered a reduction for acceptance of responsibility based on Kole's guilty plea.

4

II. Discussion

A. The Statutory Framework

21 U.S.C. S 960(b)(1)(A) provides in part:

> If any person commits any of the prohibited acts set forth [in S 960] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment . . . .

This enhancement is, however, subject to the limitations set forth in 21 U.S.C. S 851(c)(2) which provides:

> A person claiming that a [prior felony drug] conviction . . . was obtained in violation of the Constitution of the United States shall set forth his claim, and the factual basis therefor . . . . The person shall have the burden of proof by a preponderance of the evidence on any issue of fact raised by the response.

Here, it is not disputed that Kole's conviction in the Philippines was for a "felony drug offense" as that term is used in S 960. Nor is it disputed that she was not entitled to a jury trial under the law of the Philippines, or that her defense attorney there also represented all of her codefendants.[2] The district court ruled that, although Kole was not entitled to a jury trial, her Philippine conviction could still be used to enhance her sentence under S 960 because the conviction was obtained in a manner that was consistent with notions of fundamental fairness embodied in the Constitution, and was therefore "not obtained in violation of the Constitution" as that phrase is used in S 851. The court also ruled that Kole had not met her burden of showing that her defense attorney's joint representation of herself and Ike deprived her of effective assistance of counsel.

_____

2. However, Kole limits her claim of an improper conflict to her attorney's
joint representation of her and Ike.

5

B. The District Court's Analysis

In rejecting Kole's claim, the district court relied upon a series of cases known as the "Insular Cases."[3] The district court also relied in part upon Custis v. United States, 511 U.S. 485 (1994), but the court rejected the government's argument that Custis limited the scope of attack allowed under S 851(c)(2). See Dist. Ct. Op. at 5.

In Custis, the defendant was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. S 922(g)(1). Prior to trial the government notified him that it would seek to enhance his sentence under the Armed Career Criminal Act of 1984, 18 U.S.C. S 924(e) ("ACCA"). That provision

> raises the penalty for possession of a firearm by a felon from a maximum of 10 years . . . to a mandatory minimum sentence of 15 years and a maximum of life in prison . . . if the defendant has three previous convictions . . . for a violent felony or serious drug offense.

Custis, 511 U.S. at 487 (internal quotation marks omitted). The defendant had a prior state court conviction for robbery, and two prior state court convictions for burglary. However, at his sentencing hearing in federal court, he challenged the use of two prior state court convictions arguing that he had been denied his Sixth Amendment right to effective assistance of counsel in those prosecutions. He asserted that his attorney in those two cases had not advised him of a possible defense of voluntary intoxication, and that he would have gone to trial rather than plead guilty had he known of that defense. Id. at 488.

The sentencing judge denied the challenge, and the court of appeals affirmed. The court of appeals reasoned that S 924(e) did not expressly provide for collateral attack of the

_____

3. See Dist. Ct. Op. at 9. The "Insular Cases" refers to a group of cases that include Balzac v. Porto Rico, 258 U.S. 298 (1922); Dorr v. United States, 195 U.S. 138 (1904); Hawaii v. Mankichi, 190 U.S. 197 (1903); Downes v. Bidwell, 182 U.S. 244 (1901). As noted below, these cases are discussed in Commonwealth of Northern Mariana Islands v. Atalig, 723 F.2d 682-4 (9th Cir. 1984).

predicate enhancement convictions. The court stated that considerations of comity and federalism weighed against such collateral attacks on state convictions in federal proceedings and that it was impractical to allow the "fact intensive inquiries" necessary to resolve such a collateral attack. Id. at 490. The court did, however, recognize "the right of a defendant who had been completely deprived of counsel to assert a collateral attack on his prior convictions." Id. at 489. The Supreme Court affirmed. It reasoned that Congress did not intend to allow a collateral attack of the predicate enhancement convictions under S 924(c) because it had omitted any language allowing a defendant to do so. The Court viewed that omission in context with the specific grant of such a right in 21 U.S.C. S 851(c)(2). The Court stated:

> The language of S 851(c) shows that when Congress intended to authorize collateral attacks on prior convictions at the time of sentencing, it knew how to do so. Congress' omission of similar language in S 924(e) indicates that it did not intend to give defendants the right to challenge the validity of prior convictions under this statute.

511 U.S. at 492. Moreover, the Court reasoned that since Custis was still in custody on the state charges he was attacking, he could seek a writ of habeas corpus to review the prior convictions.

In the district court here, the government asserted that the scope of the collateral attack authorized inS 851(c) was limited to the fact of representation, and could not be stretched to allow an inquiry into the quality of an attorney's stewardship.4 Since Kole had been represented

_____

4. In its brief before us, the government assumes arguendo that Kole can challenge the constitutionality of her Philippine conviction though the government states "neither the statute's express language -- authorizing challenges to `a conviction' -- nor its legislative history addresses this question." Appellee's Br. at 14. However, the text of the statute is so clear as to leave no room to doubt that a defendant in Kole's circumstance can collaterally challenge the constitutionality of her foreign conviction under 21 U.S.C. S 851(c)(2).

during the prosecution in the Philippines, the prosecution insisted that her Sixth Amendment challenge was without merit. The district court rejected that view stating:

> The government does not explain why the boundaries drawn around collateral attack in Custis, which relate to collateral attack in the absence of statutory authorization therefor, should be interpreted by this court to be the same boundaries that apply to a statutorily authorized collateral attack on an extraterritorial conviction. . . . The Court rejects this argument
>
> . . . .
>
> The government also argues that only `fundamental' rights attach abroad and that Custis establishes that effective assistance is not among these. The Court will not give Custis such a broad application.

Dist. Ct. Op. at 5. Nevertheless, the district court ruled that Kole had not met her burden of proof as to her claim of ineffective assistance of counsel, and rejected her Sixth Amendment claim. The court also refused to rule that the absence of a jury trial under the Philippine legal system constituted a per se bar to using that conviction to enhance her current sentence. Rather, the court examined the basic

_____

Judge Alito does not agree that 21 U.S.C. S 851(c)(2) authorizes Kole to challenge the use of her Philippine conviction under 21 U.S.C. S 960(b)(1)(A). Judge Alito doubts that a conviction of a foreigner in a foreign court for conduct on foreign soil obtained without the participation by American agents can be viewed as having been "obtained in violation of the Constitution of the United States." 21 U.S.C. S 851(c)(2). Since Congress provided for foreign convictions to be counted under 21 U.S.C. S 960(b)(1)(A), see 21 U.S.C. SS 802(44), 960(b), he thinks that it would have been reasonable for Congress to have furnished a mechanism for challenging the reliability and fairness of such convictions, but he finds it difficult to construe the text of 21 U.S.C. S 851(c)(2) as doing so. However, assuming for the sake of argument that Kole has a statutory or constitutional right to challenge the use of her Philippine conviction for present purposes, he is convinced that the right would not exceed the bounds set out in the court's opinion, and he agrees with the court that the challenge must fail.

principles of the Philippine legal system, the circumstances surrounding her conviction, and Judge Felix's decision, and concluded that her conviction was obtained in a manner that was consistent with fundamental fairness, and it therefore met the test of constitutionality that Congress intended under 21 U.S.C. S 851(c)(2).

On appeal, Kole argues that the district court's "limitation of the application of Section 851(c)(2) to foreign convictions is in direct conflict with the plain meaning of the statute," Appellant's Br. at 30, and she again argues that Congress intended to exclude any foreign conviction that does not "comport with the United States Constitution." Appellant's Br. at 31. The government counters by arguing that the district court correctly "found that the right to trial by jury is not a fundamental right but is rather a mode of procedure guaranteed . . . in the United States." Appellee's Br. at 21 (citations and internal quotation marks omitted).

C. The Insular Cases

Kole's assertion as to her right to a jury trial implicates a debate that the Supreme Court discussed in Board of Engineers v. Otero, 426 U.S. 572 (1975). There, the Court had to determine the constitutionality of a provision of the law of Puerto Rico that prevented anyone who was not a United States citizen from obtaining a license as a civil engineer in Puerto Rico. In the course of striking down the provision, the Court noted the doctrines of incorporated and unincorporated territories that emerged from the holdings in the Insular Cases. Under those holdings, the Constitution applied "with full force" to"[t]erritories destined for statehood from the time of acquisition . . . ." Id. at 601. However, only " `fundamental' constitutional rights were guaranteed to the inhabitants" of "[t]errirtories not possessing that anticipation of statehood." Id. Since Puerto Rico was not acquired with the anticipation that it would become a state, "the Constitution was held not to extend Ex Proprio vigore to the inhabitants of Puerto Rico." Id.

Here, we must decide whether the Constitution applies Ex Proprio vigore to the Philippines. As we note below, that

9

question was answered in Dorr v. United States, 195 U.S. 138 (1904). However, a brief discussion of the historical context in which Dorr was decided, and the background of the legal protections afforded under Philippine law will assist our inquiry into whether using Kole's Philippine conviction to enhance her current sentence is consistent with Congress' intent in enacting S 851(c)(2).

D. Background of the Legal System
in the Philippines

Effective as of 1899, Spain ceded the Philippines to the United States under a treaty that gave the Congress of the United States the authority to determine the "civil rights and political status" of the people of the Philippines. Cabebe v. Acheson, 183 F.2d 795, 798 (9th Cir. 1950). "The Spanish system, in force in the Philippines, gave the right to the accused to be tried before judges, who acted in effect as a court of inquiry, and whose judgments were notfinal until passed in review before [a superior court] with a right of final review . . . in the supreme court at Madrid." Dorr, 195 U.S. at 145. In 1902, Congress created the Philippine Commission and authorized it "to exercise the powers of government" in the Philippines (the "Act of 1902"). Kepner v. United States, 195 U.S. 100, 116 (1904). That legislation established certain requirements for any law subsequently enacted by the Philippine Commission.5  In doing so, Congress transplanted many of the protections of the Bill of Rights to the Philippines. For example, one of the provisions of the Act of 1902 prevented the Philippine Commission from enacting any law "which shall deprive any person of life, liberty, or property without due process of law . . . ." Id. at 117. The Act of 1902 also provided for certain guarantees including several guarantees for persons accused of crime. These included a prohibition against unreasonable searches and seizures, the right to counsel, the right to testify in one's own behalf, as well as the right

_____

5. The Independence of the Philippines was later authorized under the Philippine Independence Act of 1934, 48 Stat. 456 that provided for "the complete independence of the Philippine Islands" within ten years from enactment of that legislation.

to refrain from doing so, and a prohibition against being "twice put in jeopardy of punishment." Id. at 118.

In Kepner, an attorney in the Philippines was charged with embezzlement, tried before a judge without a jury, and acquitted. However, the United States appealed to the Supreme Court of the Philippines which reversed, found Kepner guilty, and sentenced him to a term of imprisonment. Kepner appealed to the United States Supreme Court arguing that the appeal following his acquittal subjected him to double jeopardy in violation of the laws governing the Philippines as well as the United States Constitution. The government argued that the prohibition against double jeopardy in the Act of 1902, and the subsequent limitations that had been imposed by the Philippine Commission had to be interpreted in context with the system of law that prevailed before Spain ceded the islands to the United States. Under that law, no jeopardy attached in a criminal prosecution "until there had been a final judgment in the court of last resort." Id. at 121. The lower courts were deemed mere "examining courts, having preliminary jurisdiction, and the accused was not finally convicted or acquitted until the case had been passed upon in the audiencia, or supreme court, whose judgment was subject to review in the supreme court at Madrid . . . . The trial was regarded as one continuous proceeding." Id.

The Court concluded that Congress intended to adopt "a well-known part of the fundamental law of the United States, and to give much of the beneficent protection of the Bill of Rights to the people of the Philippine Islands . . . ." Id. at 122. The Court noted that the President had instructed the Philippine Commission to "engraft" "some . . of the essential principles of American constitutional jurisprudence . . . upon the law of [the Philippines]." Id. at 122. The President had charged:

>       the Commission should bear in mind . . . that there are
>       certain great principles of government which have been
>       made the basis of our governmental system, which we
>       deem essential to the rule of law and the maintenance
>       of individual freedom, . . . that there are also certain
>       practical rules of government which we have found to

11

be essential to the preservation of these great principles of liberty and law, and that these principles . . . must be established and maintained in their islands for the sake of their liberty and happiness, however much they may conflict with the customs of laws or procedure with which they may be familiar. .. . Upon every . . . branch of the government of the Philippines, therefore, must be imposed these inviolable rules: That no person shall be deprived of life, liberty or property without due process of law. . .

Id. at 123 (internal quotation marks omitted). The Court then listed certain guarantees that it believed had to be included in the notion of "due process" regardless of the customs of the people in the Philippines. These included the right to speedy and public trial, the right to be informed of the nature of any accusation, and to confront one's accusers, and the right to counsel. The Court then held that the concept of double jeopardy guaranteed in the Philippines must be interpreted in view of the English common law and, under that system, jeopardy attached at the first trial. Thus, the accused could not be retried for the same offense following acquittal.

The same day that the Court decided Kepner, it decided Dorr. There, the issue was whether, "in the absence of a statute expressly conferring the right, trial by jury was a necessary incident of judicial procedure in the Philippines." Id. The Court stated the issue as follows:

Must Congress, in establishing a system for trial of crimes and offenses committed in the Philippine Islands, carry to their people by proper affirmative legislation a system of trial by jury?

Id. at 143. The Court reviewed the history of the Philippines and noted several features of the Spanish legal system that governed those islands before they were ceded to the United States. The Court reasoned that, even though the Constitution contained no express provision as to the nature of the rights, if any, that Congress must extend to territories that the United States seeks to govern under its treaty power, "there may nevertheless be restrictions of so fundamental a nature that they cannot be transgressed,

12

although not expressed in so many words in the Constitution." Id. at 147. The Court concluded that there were such rights, but the right to a jury trial was not among them.

> If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the United States extends, or if Congress, in framing laws for outlying territory belonging to the United States, was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established . . .

Id. at 148. The Court held that the Constitution "does not require [Congress] to enact for ceded territory . . . a system of laws which shall include the right of trial by jury, and that the Constitution does not, without legislation, and of its own force, carry such right to territory so situated." Id. at 149.

We conclude that Congress did not intend a contrary result when it enacted 21 U.S.C. S 851. Rather, as the district court concluded, Congress intended only to ensure fundamental fairness by excluding any conviction that was obtained in a manner inconsistent with concepts of fundamental fairness and liberty endemic in the Due Process Clause of the Fifth Amendment of the United States Constitution.

As Justice Harlan noted in his dissent in Duncan v. Louisiana, 391 U.S. 145, 177 (1968), "[t]he Bill of Rights is evidence, at various points, of the content Americans find in the term `liberty' and of American standards of fundamental fairness." Thus, " `Due Process' expresses the requirement of `fundamental fairness,' " Lassiter v. Department of Soc. Serv. of Durham County, North Carolina, 452 U.S. 18, 24 (1981) (inquiring into whether the Due Process Clause required appointed counsel for litigant in civil litigation). In Lassiter, the Court stated "[a]pplying the Due Process Clause is therefore an uncertain enterprise which must discover what `fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." Id.

13

In Duncan, the Supreme Court examined the right of a
jury trial under the United States Constitution.

> The question has been asked whether a right is among
> those fundamental principles of liberty and justice
> which lie at the base of all our civil and political
> institutions; whether it is basic in our system of
> jurisprudence; and whether it is a fundamental right,
> essential to a fair trial.

Duncan, 391 U.S. at 148-9 (1968) (internal quotation marks
and citations omitted). The Court held that the right to a
jury trial for one accused of a serious crime is so
fundamental to our system of liberty that it is incorporated
into the Due Process Clause of the Fourteenth Amendment,
and therefore applicable to state prosecutions. In doing so,
the Court briefly commented upon the historical
importance of that right to the "Founding Fathers" and the
pervasive extent to which the right had been incorporated
into the constitutions of the various states. The Court noted
"[e]ven such skeletal history is impressive support for
considering the right to jury trial in criminal cases to be
fundamental to our system of justice, an importance
frequently recognized in the opinions of this Court." Id. at
153. The Court reasoned that the jury trial functioned in
tandem with an independent judiciary to protect against
abuses by the state. The interposition of a jury of lay
persons between the accuser, and the accused checked
abuses of power.

> The guarantees of jury trial in the Federal and State
> Constitutions reflect a profound judgment about the
> way in which law should be enforced and justice
> administered. A right to jury trial is granted to criminal
> defendants in order to prevent oppression by the
> Government. Those who wrote our constitutions knew
> from history and experience that it was necessary to
> protect against unfounded criminal charges brought to
> eliminate enemies and against judges too responsive to
> the voice of higher authority.

Id. at 155-6. Thus, the Court concluded that the concept of
Due Process under the Fourteenth Amendment included
the right to a jury trial for serious crimes.

14

Kole's argument is bottomed upon an assumption that Congress could not have intended to allow a conviction that was obtained in violation of such a fundamental right to enhance a subsequent sentence in a court of the United States. However, this position overlooks the purpose behind S 960 as well as the fact that jury trials, though fundamental to the system of justice established under the United States Constitution, are nevertheless relatively unique to that system.

> Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossible without [trial by jury]. . . The question thus is whether given this kind of system a particular procedure is fundamental--whether, that is, a procedure is necessary to an Anglo-American regime of ordered liberty.

Duncan, 391 U.S. at 149, n.14. Although the Court answered that question in the affirmative as applied to the American legal system, it left no doubt that other societies may well be able to fashion a system with no juries that is fundamentally fair to the accused, thus comporting with our concept of due process.

E. Kole's Prosecution in the Philippines Was Consistent With The Concept of Fundamental Fairness Contained In The Fifth Amendment's Due Process Clause

In 1994, the Philippine Supreme Court issued an opinion which summarizes the rights of the accused under the Philippine legal system. In People of the Philippines v. Lopez, 1994 Philippine S.Ct. Lexis 5145 (1994), four men charged with armed robbery and murder were tried before a judge. During the trial, the prosecution introduced an eyewitness who identified each of the accused, and confessions that had been signed by each of them. The four defendants offered alibi witnesses in their defense, and the trial court acquitted three of the four. The convicted defendant appealed. The Philippine Supreme Court reversed that conviction and ordered that an order of acquittal be entered in his behalf. The Court's analysis illustrates the

15

extent to which a criminal defendant in the Philippines is afforded protection similar to those afforded under our own legal system. We refer to it at length as it is of substantial assistance to our inquiry into whether Kole's conviction in the Phillipines was consistent with concepts of fundamental fairness that are implicated by 21 U.S.C. S 851.

The Court in Lopez noted that the trial court had disregarded the alibi testimony of all four defendants, but nevertheless properly acquitted three of the four because they were "merely present." The Court stated:

> from the inception of the crime to its final termination, they were merely bystanders and did not participate in one way or another in the commission thereof . . . . The mere knowledge, acquiescence or approval of the act without cooperation or agreement to cooperate is not enough to constitute one a party to a conspiracy.

Lopez, 1994 Philippine S. Ct. Lexis at *16. The Court also examined the signed confessions that the prosecution introduced and concluded that those confessions should not have been used against any of the accused as they appeared to have been coerced, and obtained without benefit of counsel. The Court rejected the prosecution's claim that any such infirmity was cured because the confessions had been witnessed and counter-signed by a municipal attorney. The Court reasoned:

> From the records, it can be gleaned that when accused-appellant Bandula and accused Dionanao were investigated . . . they had no counsel present . . . And counsel who supposedly assisted both accused was . . . the Municipal Attorney of [the village]. On top of this, there are telltale signs that violence was used against the accused. Certainly, these are blatant violations of the Constitution [of the Philippines] which mandates in Sec. 12, Art. III, that:
>
> (1) Any person under investigation . . . shall have the right to be informed of his right to remain silent and to have competent and independent counsel preferably of his own choice. If the person cannot afford the services of counsel, he must be provided with one. These rights

16

cannot be waived except in writing and in the presence
of counsel.

(2) No torture, force, violence, threat, intimidation or
any other means which vitiate the free will shall be
used against him. . . .

(3) Any confession or admission obtained in violation
. . . hereof shall be inadmissible in evidence against
him.

Id. at *19-*20. The Court then elaborated upon the right to
counsel, the right to remain silent, and the duty of
arresting officers under the Philippine Constitution.

At the time a person is arrested, it shall be the duty of
the arresting officer to inform him of the reason for the
arrest and he must be shown the warrant of arrest, if
any. He shall be informed of his constitutional right to
remain silent and to counsel, and that any statement
he might make could be used against him. The person
arrested shall have the right to communicate with his
lawyer, relative, or anyone he chooses by the most
expedient means . . . . It shall be the responsibility of
the arresting officer to see to it that this is
accomplished. No custodial investigation shall be
conducted unless it be in the presence of counsel . . . .
The right to counsel may be waived but the waiver
shall not be valid unless made with the assistance of
counsel . . . .
[T]he right to counsel attaches upon the start of an
investigation, . . . . Hence, if there is no counsel at the
start of the custodial investigation . . . any statement
elicited from the accused is inadmissible in evidence
against him. . . .

Id., at *21-2. The Court ruled that the prosecution had not
met its burden of proving that the statements of the
accused were properly obtained and therefore the
statements should not have been admitted into evidence.
The Court rejected the prosecution's argument that the
propriety of the statements was corroborated by the
signature of the village attorney who had apparently been
present when the statements were taken.

17

> The Constitution also requires that counsel be independent. Obviously he cannot be a special counsel, public or private prosecutor, counsel of the police, or a municipal attorney whose interest is admittedly adverse to the accused. . . . Attorney Zerna assisted [the defendants] when they executed their respective extrajudicial confessions . . . . As legal officer of the municipality, he provides legal assistance and support to the mayor . . . . He is no better than a . . . prosecutor who cannot represent the accused during custodial investigations.

Id. at *24. The Court also noted that the circumstances under which the statements had been taken suggested that the statements had been coerced.

> For, why did the investigators not inform the accused of their right to remain silent and to have competent and independent counsel . . . even before attempting to elicit statements that would incriminate them? Why did the investigators not advise the accused that if they could not afford the services of counsel they could be provided with counsel free of charge? . . . How did accused Sedigo get his `black eye' . . .? How and why did accused–appellant . . . suffer a fractured rib? We cannot close our eyes to these unanswered questions. This Court is greatly disturbed with the way the accused were treated or mistreated. In fine, we cannot accept the extrajudicial confessions of the accused and use the same against them or any of them. Where there is doubt as to their voluntariness, the same must be rejected in toto.

Id. at *25. Accordingly, the Court declared that the trial court improperly used the confessions against the appellant. The Court then examined the remaining evidence and concluded that it was not sufficient to convict the appellant. Even though the prosecution had produced the testimony of an eyewitness who identified the appellant, the Philippine Supreme Court ruled that the record did not establish sufficient opportunity to observe, nor sufficient indicia of reliability to convict based solely upon that identification. The Court ruled "the prosecution is left with nothing but the alleged positive identification of appellant

18

. . . by witness Salva. But this by itself does not measure up to the required standard of moral certainty." Id. at 26.[6] The Court ordered that a judgment of acquittal be entered. In doing so, the court left no doubt about the importance of fundamental liberty under the Philippine legal system. The Court stated:

> [I]t is unfortunate that the investigators who are sworn to do justice to all appear to have toyed with the fundamental rights of the accused. Men in uniform who are sworn to do justice to all appear to have toyed with the fundamental rights of the accused. Men in uniform do not have blanket authority to arrest anybody they take fancy on, rough him up and put words into his mouth. There is a living Constitution which safeguards the rights of an accused, a penal law which punishes maltreatment of prisoners and a statute which penalizes failure to inform and accord the accused his constitutional rights.

Id. at 27-8.

Clearly, the legal system of the Philippines seeks to guard the individual against official tyranny and protect individual liberty. Congress could not have intended S 851 to be used to exclude criminal convictions obtained under such a system merely because that sovereign provides a method of protecting fundamental liberties that does not include the right to trial by jury.

> It would . . . be a form of cultural imperialism for the United States to insist that it would not countenance, for U.S. purposes, recognition of a foreign criminal judgment which came from a legal culture which did not employ the jury.

United States v. Moskovits, 784 F. Supp. 193, 196 (E.D. Pa. 1992) (Pollak, J.).

_____

6. Though the Court spoke of proof to a "moral certainty" it does not appear that the standard of proof needed to convict an accused in the Philippines differs from the "reasonable doubt" standard. The Court also stated "[w]ith the failure of the prosecution to prove the guilt of accused-
appellant . . . beyond reasonable doubt, acquittal should follow as a matter of course." Id. at 28 (emphasis added).

Here, Judge Felix's opinion reflects the judicial independence and respect for the rights of the accused that the Philippine Supreme Court speaks of in Lopez. Judge Felix noted that the police who searched Kole's apartment did not have a search warrant, but allowed the seized drugs into evidence because the owner of the condominium complex gave police written consent to search, and because police feared that the suspects were about to leave the jurisdiction. App. at 94. However, even after admitting the physical evidence, the trial judge was so skeptical of much of the testimony of the police and their informant, that he acquitted four of the defendants who were tried with Kole. App. at 106 ("[t]he act imputed by the prosecution on the group . . . is very much not in accord with the natural course of things and human experiences, so that it evokes serious doubt on the truth of the offense charged.").

However, despite his skepticism the trial judge did accept some of the prosecution's testimony stating that "[the informant's] testimony was not completely discredited." App. at 107. In doing so, he applied the maxim so familiar to our own system of jurisprudence that a "witness may be disbelieved in some facts but may be believed in other facts. . . ." Id. He also noted that the mere presence of some of the accused did not establish their guilt. App. at 110. However, he concluded that the government had met its burden of proof as to the guilt of Kole, and Ike, because they were in "full control and management" of the room where the heroin was found, and because he did not accept their explanation of their flight when the police entered their apartment. App. at 107, 108.

Judge Felix's opinion reflects the kind of careful, searching analysis of evidence that one would expect from a trial judge in the United States. The fact that Kole was denied a jury trial under the jurisdiction where she obtained her "prior conviction for a felony drug offense" in no way undermines her conviction there.

The text of 21 U.S.C. S 960 reflects a congressional intent to significantly increase sentences for drug offenders with prior convictions for felony drug offenses. Repeat drug offenders are clearly more culpable than first time offenders, and the enhanced sentences required under

20

S 960 serve to incapacitate and punish those who have continued their involvement with drug trafficking despite prior prosecution. Given Congress' concern, it would not be logical to limit the enhancement to those persons who had been convicted of a prior drug felony (or its equivalent) only in the United States. This is particularly true in view of the conduct included under S 960. 21 U.S.C. S 960(a)(1) states "any person who . . . knowingly or intentionally imports or exports a controlled substance . . . shall be punished as provided in subsection (b)." (emphasis added). We do not think that Congress enacted a law that was intended to reach persons involved in international drug trafficking and then limited enhanced penalties to those persons who had previously been convicted in a court in the United States. That is inconsistent with Congress' attempt to reach those involved in importing or exporting controlled substances. Yet, since the United States Constitution does not apply to any foreign sovereign, that would be the result of adopting Ms. Kole's argument.

F. Ineffective Assistance of Counsel

Kole also argues that use of the Philippine conviction violated her Sixth Amendment right to counsel because her trial attorney labored under an irreconcilable conflict of interest that prevented him from effectively representing her. In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Court established a two-part test for evaluating a claim of ineffective assistance of counsel and we apply it here. Under Strickland, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." Id. If defendant is able to make that showing, he or she must then establish that counsel's dereliction prejudiced the defendant. Where the claim rests upon an alleged conflict of interest, defendant"must identify something that counsel chose to do or not do, as to which he had conflicting duties, and must show that the course taken was influenced by that conflict." Vance v. Lehman, 64 F.3d 119, 124 (3d Cir. 1995) (citing Burger v. Kemp, 483 U.S. 776 (1987); United States v. Gambino, 788 F.2d 938 (3d Cir. 1986). In other words, the defendant must "show some actual conflict of interest that adversely

21

affected his counsel's performance in order to prevail." United States v. Preston, 910 F.2d 81, 88 (3d Cir. 1998) (citing Sullivan v. Cuyler, 723 F.2d 1077 (3d Cir. 1983)).

Here, Kole alleges that the joint representation created a simultaneous duty to represent Ike that prevented her defense attorney from distinguishing between her involvement and his. See Appellant's Br. at 26. Her argument suggests that her attorney could have attempted to equate Kole's role with that of the codefendants who were acquitted rather than being lumped with her fiance. However, "hindsight rationalization alone cannot support a claim of ineffective assistance of counsel." United States v. Auerbach, 745 F.2d 1157, 1162 (8th Cir. 1984). In Auerbach, the court held that joint representation of a father and son charged with various firearms offenses resulted in ineffective assistance of counsel. The joint trial allowed the prosecution to elicit testimony of the son's prior felony conviction, and "exacerbated a situation in which the sins of the son were visited on the father." Id. at 1161. The court concluded that "[t]he record . . . reveal[ed] that counsel was in the dilemma of either pursuing or abandoning defenses and tactics that would help one defendant but hurt the other." Id. The record of Kole's conviction in the Philippines does not reflect a similar dilemma. Kole's attorney mounted a vigorous attack on the credibility of the police, and informant Williams. As noted above, he was able to raise serious questions as to the credibility of the prosecutor's witnesses. In fact, the trial judge did not credit substantial portions of the prosecution's case.

Moreover, the appendix filed in this court contains a "Demurrer to Evidence" that defense counselfiled following trial, and prior to Judge Felix issuing his opinion. See Appendix 112-135. In that demurrer Kole's attorney argues that all of the physical evidence must be suppressed based upon the warrantless search, the lack of credibility of the prosecution witnesses including the police, the chemist's expertise and bias, Jacqueline Williams' open case with the police, and the likelihood of her bias based upon asserted promises that the case would be dismissed if she cooperated against Kole. After arguing that the physical

22

evidence should be suppressed, and attacking the remaining evidence, counsel argued:

> There being no independent object evidence for the prosecution . . . the prosecution is left with no other evidence to prove the guilt of the accused other than the incredible, hearsay and inconsistent testimonies which are insufficient to sustain a judgment of conviction.

App. at 131 (emphasis in original).

There is no irreconcilable tension in defense counsel's strategy. Indeed, Kole's attorney would have been hard pressed to draw distinctions between her involvement and Ike's while arguing that the police and Williams were lying about finding evidence inside of their apartment. As noted above, "an actual conflict of interest occurs when counsel cannot use his best efforts to exonerate one defendant for fear of implicating the other." United States v. Unger, 665 F.2d 251, 255 (8th Cir. 1981). Kole argues that her situation is similar to that of the appellant in Unger. See Appellant's Br. at 27. We disagree. The defense strategy used by Kole's trial counsel did not prevent him from using his best efforts to represent Kole for fear of implicating Ike.

Although Kole asserts her Philippine attorney could have used a different strategy had he not also represented Ike, she has not met her burden of proving that she was prejudiced by the joint representation. Moreover, we do not think that the strategy actually adopted compromised her defense. Since Kole and Ike occupied the apartment and had equal access to the suitcase with the heroin, a coordinated attack on the prosecution's cooperating witness, and upon the police was strategically sound. This is not the situation presented in Unger. There, defense counsel was appointed to jointly represent a husband and wife accused of kidnaping. They plead guilty, and defense counsel attempted to represent both at sentencing. Thereafter, the wife collaterally attacked her sentence under 21 U.S.C. S 2255. The court of appeals ruled that Crystal Unger had been denied effective assistance of counsel at her sentencing because her husband had provided a statement admitting that he was primarily responsible for

23

causing the infant's injuries. Obviously, counsel could not exploit that concession on behalf of Mrs. Unger while also representing her husband. Ms. Kole's situation is a far cry from the actual conflict in Unger. It is the particular circumstances of a joint prosecution of husband and wife, rather than the fact of the relationship, that creates any conflict of interest between spouses in a joint prosecution. Although the circumstances could be such that a conflict of interest would flow from the relationship of husband and wife, this is not such a case. Kole has not established such circumstances existed when she was convicted in the Philippines. Judge Felix did conclude that Kole and Ike had joint control over the apartment, and joint access to the heroin inside of it, but the conflict of interest Kole complains of is more a creature of hindsight than of record.

G. Due Process Violation

Kole also alleges that Judge Felix's findings of fact, and credibility determinations somehow denied her due process of law thus bringing that conviction under the prohibition of 18 U.S.C. S 851(c)(2). She argues that the record does not support Judge Felix's conclusion that the blue suitcase containing the heroin was found in the bedroom she shared with Ike. She also attacks various findings Judge Felix made based upon his credibility determinations. See Appellant's Br. at 39-44.

A sentencing judge denies a defendant the due process of law when he or she specifically considers "misinformation of a constitutional magnitude" in fashioning a sentence. United States v. Spiropoulos, 976 F.2d 155. 163 (3rd Cir. 1992). The trial judge obviously credited enough of the testimony of Ms. Williams to conclude that the heroin was found in Kole's apartment. That conclusion is corroborated by the testimony of the police, and even by Kole's flight following the police entry into her apartment because the court rejected Kole's explanation of that flight.7

_____

7. We note the testimony as to the location of the heroin was such that Kole's attorney assumed that fact was established if the prosecution witnesses were believed. He argued that "Sr. Insp. Lazo and Ms. Williams

24

> Factual matters considered as a basis for sentence
> must have some minimal indicium of reliability beyond
> mere allegation and must either alone or in the context
> of other available information, bear some rational
> relationship to the decision to impose a particular
> sentence.

United States v. Matthews, 773 F.2d 48, 51 (3rd Cir. 1985). Measured against this standard, Kole's due process argument fails whether her challenge is based upon inaccurate information that Judge Felix relied upon, or the district court's reliance upon the challenged Philippine conviction.

Kole's due process argument is really little more than a challenge to Judge Felix's credibility determinations. Credibility determinations are the unique province of a fact finder, be it a jury, or a judge sitting without a jury. Where the record supports a credibility determination, it is not for an appellate court to set it aside. See Hoots v. Pennsylvania, 703 F.2d 722 (3d Cir. 1983) (it is the "responsibility of the appellate court to accept the ultimate factual determination of the fact finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to supportive evidentiary data."). Judge Felix carefully considered the testimony before him. Although Kole argues otherwise, it is clear that her Philippine prosecution comported with the minimum standards of due process as reflected in the thorough and incisive opinion of the district court.

III.

For the reasons set forth above, we affirm the district court's imposition on Kole of an enhanced sentence of twenty years under 21 U.S.C. S 960(b)(1)(A).

_____

testified . . . the police . . . went inside the master's bedroom which was
opened and saw people squatting and transferring heroin . . . which testimonies are almost identical in the use of words and substance, thereby introducing suspicion that such testimonies were coached and/or rehearsed in all material points." App. at 129 (emphasis in original).

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

26